**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JENNIFER PHILLIPS, TONYA BUSH, SABRINA OWENS, KATRINA COLLINGE, KIMBERLY NILES, AMANDA FELGAR, DEBORAH HAVERKAMP, KIM WARD, TAMATHA CHEATHAM, HELIMA WOODLAND, WHITNEY JUDSON, and KIM MAYS, individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | No. 15 cv 8954

Honorable Sheila M. Finnegan |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| HELP AT HOME, LLC, f/k/a HELP AT HOME, INC., JOEL DAVIS, RICHARD CANTRELL, and MARY ANN NEWBERN, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | **JURY TRIAL DEMANDED** |

# FIRST AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT

Representative Plaintiffs, JENNIFER PHILLIPS ("Phillips"), TONYA BUSH ("Bush"), SABRINA OWENS ("Owens"), KATRINA COLLINGE ("Collinge") KIMBERLY NILES ("Niles"), AMANDA FELGAR ("Felgar"), DEBORAH HAVERKAMP ("Haverkamp"), KIM WARD ("Ward"), TAMATHA CHEATHAM ("Cheatham"), HELIMA WOODLAND ("Woodland"), WHITNEY JUDSON ("Judson"), and KIM MAYS ("Mays") (collectively "Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against Defendants HELP AT HOME, LLC f/k/a HELP AT HOME, INC. ("Help at Home"), JOEL DAVIS ("Davis"), RICHARD CANTRELL ("Cantrell"), and MARY ANN NEWBERN ("Newbern") (collectively, "Defendants"), as follows:

## NATURE OF THE CASE

1.    This action seeks redress for Defendants' willful violations of several federal and state wage and hour laws, including the Fair Labor Standards Act ("FLSA")—codified as 29 U.S.C. §§ 201 *et seq.*—the Illinois Minimum Wage Law ("IMWL")—codified as 820 ILCS 105/1 *et seq.*—and the Illinois Wage Payment and Collection Act ("IWPCA")—codified as 820 ILCS 115/1 *et seq.*  This action also seeks declaratory relief, and asserts claims for conversion.

2.    Specifically, Defendants failed to pay Plaintiffs and all other similarly situated employees wages and premium overtime compensation for hours worked in excess of 40 hours in a week.

3.    Defendants' unlawful compensation practices have, and had, the effect of denying Plaintiffs and all other similarly situated employees their earned wages, to which they are entitled.

4.    Accordingly, Plaintiffs, individually, and on behalf of all others similarly situated, seek declaratory relief, and monetary relief in the form of unpaid wages and overtime compensation, restitution, applicable damages, as well as reasonable attorneys' fees and costs.

## PARTIES

5.    Plaintiff Jennifer Phillips is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period.  Throughout that period, Phillips was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

6.    Plaintiff Tonya Bush is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period.  Throughout that period, Bush was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

7.     Plaintiff Sabrina Owens is a resident and citizen of Indiana, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Owens was an "employee" as defined by 29 U.S.C. § 203(e)(1).

8.     Plaintiff Katrina Collinge is a resident and citizen of Indiana, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Collinge was an "employee" as defined by 29 U.S.C. § 203(e)(1).

9.     Plaintiff Kimberly Niles is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Niles was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

10.     Plaintiff Amanda Felgar is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Felgar was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

11.     Plaintiff Deborah Haverkamp is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Havercamp was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

12.     Plaintiff Kim Ward is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period. Throughout that period, Ward was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

13.     Plaintiff Tamatha Cheatham is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period. Throughout that period,

Cheatham was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

14.     Plaintiff Helima Woodland is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period.  Throughout that period, Woodland was an "employee" as defined by 29 U.S.C. § 203(e)(1).

15.     Plaintiff Whitney Judson is a resident and citizen of Illinois, and worked for Defendants during the applicable statute of limitations period.  Throughout that period, Judson was an "employee" as defined by 29 U.S.C. § 203(e)(1), 820 ILCS 105/3(d), and 820 ILCS 115/2.

16.     Plaintiff Kim Mays is a resident and citizen of Indiana, and worked for Defendants during the applicable statute of limitations period.  Throughout that period, Mays was an "employee" as defined by 29 U.S.C. § 203(e)(1).

17.     Defendant Help at Home, LLC is an Illinois limited liability company with its principal place of business located at 1 North State Street, Suite 800, Chicago, Illinois 60602.

18.     Defendant Help at Home, LLC was formerly known as Help at Home, Inc., before it was reclassified as an LLC from a corporation on June 19, 2015.  This reclassification was cosmetic only, and did not affect Help at Home's business operations.  As such, Help at Home, Inc. transferred any and all ongoing liabilities to Defendant Help at Home, LLC at the time of that reclassification.

19.     At all times relevant to this action, Defendant Help at Home was an "employer" as defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), and 820 ILCS 115/2.

20.     Help at Home's business enterprise has many employees who are engaged in commerce, and many employees who regularly and recurrently handle goods that have travelled in interstate commerce.

21.     Help at Home's business enterprise has an annual gross volume of business done in excess of $500,000.

22.     Based on the foregoing, Help at Home's business enterprise is engaged in commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

23.     Defendant Davis became the President of Help at Home in or about late 2017. Prior to becoming President of Help at Home, Davis was the Chief Operating Officer of Help at Home at all other times relevant to this action. As set forth below, Davis is an "employer" as defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), and 820 ILCS 115/2.

24.     Defendant Cantrell became the Chief Operating Officer of Help at Home in or about late 2017. Prior to becoming Chief Operating Officer of Help at Home, Cantrell was a Regional Vice President ("RVP") for Help at Home at all other times relevant to this action. As set forth below, Cantrell is an "employer" as defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), and 820 ILCS 115/2.

25.     At all times relevant to this action, Defendant Newbern was an RVP for Help at Home. As set forth below, Newbern is an "employer" as defined by 29 U.S.C. § 203(d), 820 ILCS 105/3(c), and 820 ILCS 115/2.

## JURISDICTION AND VENUE

26.     This Court has personal jurisdiction, pursuant to 735 ILCS 5/2-209, over Defendants because they are all doing business within the State of Illinois.

27.     This Court has subject matter jurisdiction over Plaintiffs' FLSA and declaratory judgment claims pursuant to 29 U.S.C. § 216(b), 28 U.S.C. § 2201, and 28 U.S.C. § 1331.

28.     This Court has supplemental jurisdiction over Plaintiffs' IMWL, IWPCA, and conversion claims, pursuant to 28 U.S.C. § 1367, because they are so related to Plaintiffs' FLSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

29.     Venue is properly placed in this District, pursuant to 28 U.S.C. § 1391(b), because the facts and events giving rise to Plaintiffs' claims occurred in this District.

## SUBSTANTIVE ALLEGATIONS

### *Help at Home's Services*

30.     Help at Home provides home healthcare services in several states, including Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Missouri, South Carolina, and Tennessee.

31.     Help at Home's business is divided into numerous local branch offices ("Branches").  Each Branch is responsible for coordinating, supervising, and providing Help at Home's home healthcare services to customers in the surrounding area.

32.     Help at Home has Branches in Georgia, Illinois, Indiana, Kentucky, Michigan, Missouri, South Carolina, and Tennessee.  Although Help at Home provides home healthcare services to clients in Iowa, those clients are serviced out of some of Help at Home's Branches located in Illinois.  Similarly, although Help at Home provides home healthcare services to clients in Kansas, those clients are serviced out of some of Help at Home's Branches located in Missouri.

33.     As part of Help at Home's home healthcare services, caretakers are assigned to assist clients according to the clients' needs.  These caretakers range from nurses and certified nursing assistants to "homemakers" and "companions."

34.     Help at Home's home healthcare services are generally divided into three categories: (1) personal care ("PC"), (2) developmentally disabled ("DD"), and (3) skilled care ("Skilled").

35.     Help at Home offers PC services at its Branches located in Georgia, Illinois, Indiana, Missouri, and South Carolina.  In addition, Help at Home has offered PC services at its Branches located in Kentucky, Michigan, and Tennessee at some point during the time period relevant to this action.

36.     Help at Home's PC clients are generally individuals who have physical deficiencies that render common activities of daily living—such as meal preparation, housekeeping, and driving—difficult to perform.  As such, in Help at Home's PC line of service, caretakers perform basic services that do not require any advanced skillset or training, and merely assist Help at Home's PC clients in performing those tasks.

37.     Help at Home offers DD services at its Branches located in Illinois, Indiana, Missouri, Kentucky, Michigan, and Tennessee.

38.     In Help at Home's DD line of service, caretakers provide basic services to Help at Home's DD clients, and these basic services are similar to the services caretakers provide to clients in Help at Home's PC line of service.  However, because Help at Home's DD clients are generally individuals who have developmental disabilities—such as intellectual, behavioral, or social deficits—caretakers oftentimes are required to have specialized training or skillsets to deal with those developmental disabilities.

7

39.     Help at Home offers Skilled services at its Branches located in Indiana and Missouri.  In addition, Help at Home has offered Skilled services at its Branches located in Illinois at some point during the time period relevant to this action.  In Kentucky, Michigan, and Tennessee Help at Home offers Skilled services as part of its DD services.

40.     In Help at Home's Skilled line of service, caretakers provide basic services to Help at Home's Skilled clients that are similar to the services caretakers provide to Help at Home's PC and DD clients.  In addition, Help at Home's Skilled caretakers may also be required to provide rudimentary medical care—*e.g.*, administering medication—to clients.

### *Help at Home's Organizational Structure*

41.     Each of Help at Home's Branches employs staffing supervisors[1] who oversee the caretakers and the provision of Help at Home's home healthcare services to its customers.

42.     In Help at Home's PC line of service, PC Supervisors communicate with Help at Home's PC clients, determine the particular services PC clients require, assign caretakers to PC clients, coordinate the particular services provided by PC caretakers to PC clients, create and modify PC caretakers' schedules, evaluate PC caretakers' individual performance, and discipline PC caretakers.

43.     PC Supervisors generally perform their jobs while physically present at Help at Home's Branch offices.  However, in some Branches, PC Supervisors are also required to visit Help at Home's PC clients to perform caretakers' responsibilities in the event that PC Supervisors are unable to find caretakers to see PC clients for scheduled visits.

---

[1] Help at Home uses several different job titles to describe this position, including: "supervisors," "scheduling supervisors," "schedulers," "coordinators," or "field coordinators."  Despite these different titles, these individuals in this position all have the same job duties and functions, as set forth below.  Accordingly, all of the individuals will be referred to collectively, as "Supervisors."

44. In Help at Home's DD line of service, DD Supervisors assign DD caretakers with the necessary skills to DD clients, create and modify DD caretakers' schedules, help evaluate those designated DD caretakers' individual performance, and help discipline those designated DD caretakers. Help at Home's DD Supervisors also communicate with Help at Home's DD clients as necessary.

45. DD Supervisors generally perform their jobs while physically present at Help at Home's Branch offices. However, DD Supervisors are also required to visit Help at Home's DD clients to perform caretakers' responsibilities in the event that DD Supervisors are unable to find caretakers to see DD clients for scheduled visits.

46. When they are physically present at the office, Help at Home's DD Supervisors perform substantially similar duties with respect to DD clients as PC Supervisors perform with respect to PC clients. However, employees known as "Qs" or "Program Coordinators"—and not DD Supervisors—designate which services need to be provided to particular DD clients, in light of those clients' particular developmental deficiencies and the relevant state regulatory guidelines. Other than this minor difference, the job duties of PC Supervisors and DD Supervisors are substantially the same.

47. In Help at Home's Skilled line of service, Skilled Supervisors assign Skilled caretakers with the necessary skills to Skilled clients, create and modify Skilled caretakers' schedules, help evaluate those designated Skilled caretakers' individual performance, and help discipline those designated Skilled caretakers. Help at Home's Skilled Supervisors also communicate with Help at Home's Skilled clients as necessary.

48. When they are physically present at the office, Help at Home's PC and DD Supervisors perform substantially similar duties with respect to PC and DD clients as Skilled

9

Supervisors perform with respect to Skilled clients. Indeed, Help at Home's Skilled services are usually performed ancillary to, or in conjunction with, Help at Home's PC and DD services.

49. Since caretakers in Help at Home's Skilled line of service may be required to provide rudimentary medical care to Skilled clients, Help at Home's Skilled services are overseen by a licensed nurse. Those nurses perform a role relative to Help at Home's Skilled services that is similar to the role Qs perform relative to Help at Home's DD services. Other than this minor difference, the job duties of PC, DD, and Skilled Supervisors are substantially the same.

50. In sum, while DD Supervisors may work in conjunction with Qs, and Skilled Supervisors may work in conjunction with licensed nurses, PC, DD, and Skilled Supervisors work primarily in an office setting, identify and schedule caretakers, and assist in coordinating the care provided to Defendant's clients.

51. At many Branches, Supervisors are also required to work "on-call" during the evenings and weekends. Supervisors' responsibilities with respect to on-call work are discussed more fully below.

52. All Supervisors are paid on an hourly basis.

53. Accordingly, all Supervisors share similar job titles, training, job descriptions, job requirements, and compensation plans, amongst other things.

54. Each of Help at Home's Branches has a branch manager ("Branch Manager") who manages the day-to-day activities at the Branch. Among other things, Branch Managers are responsible for seeking out new potential customers that may need Help at Home's services, coordinating with government agencies to obtain compensation for services provided to Help at

Home's customers, keeping and maintaining records relative to their respective Branch offices' budget, and overseeing the work completed by Supervisors.

55.     However, as set forth below, Branch Managers have very limited authority and discretion with respect to the management of their respective Branches.

56.     Rather, much of the authority with respect to the management of Help at Home's Branches is vested in Help at Home's RVPs, as described below.  Each Branch Manager reports to an RVP who oversees all of Help at Home's Branches in a particular "Region."

57.     At all times relevant to this action, Defendant Cantrell oversaw and managed the Region consisting of all Branches located in Indiana, Kentucky, Michigan, Missouri, and Tennessee, as well as the Illinois Branches located in Bradley, Dixon, Freeport, Galesburg, Joliet, Macomb, Moline/Rock Island, Ottawa, Rockford, St. Charles, Waukegan/Gurnee, Wheaton, and Woodridge.  Until late 2017, Cantrell managed this Region as its RVP.  After Cantrell became Help at Home's Chief Operating Officer, his duties with respect to management of this Region remained the same.

58.     At all times relevant to this action, Maria James ("James") was the RVP who oversaw and managed the Region consisting of the Illinois Branches located in Albany Park, Archer Heights, Chatham, Chicago, Chinatown, Crystal Lake, Northwest Chicago, Oak Forest, Oak Park, Rogers Park, Schaumburg, Skokie, Uptown, Wheeling, and Worth.

59.     At all times relevant to this action, Newbern was the RVP who oversaw and managed the Region consisting of the Illinois Branches located in Alton/Wood River, Charleston, Danville, Decatur, Fairfield, Fairview Heights, Marion, Metropolis, Mt. Vernon, Pekin, Peoria, Pittsfield, and Springfield.

11

60.     Until approximately April 20, 2017—when she retired—Edna Kepper ("Kepper") was the RVP who oversaw and managed the Region consisting of all Branches located in South Carolina and Georgia.  It is unknown to Plaintiffs who is the new RVP of this Region.

61.     RVPs report directly to Help at Home's highest level managers—Defendant Davis, and Help at Home's Chief Executive Officer Ronald Ford ("Ford").  According to Davis, he and Ford manage Help at Home's operations as "peers."  As noted above, Davis recently became Help at Home's President.  Prior to becoming Help at Home's President, Davis was the Chief Operating Officer of Help at Home, but according to Davis, his responsibilities have "not [changed] one bit."

62.     Although RVPs are given significant discretion in articulating policies for the Branches in their respective Regions, Davis collaborates with the RVPs to, *inter alia*, set those policies in accordance with the needs of each Region, and ensure that those policies comply with applicable law.  The RVPs also collaborate with one another to establish uniformity of Help at Home's policies across Regions, and adopt each other's policies where appropriate—specifically with regard to operational policies affecting employee compensation.

63.     Davis is also responsible for creating Help at Home's policies and communicating those policies to the RVPs.  The RVPs are then responsible for implementing, communicating, and enforcing policies within their respective Regions.

64.     All of Help at Home's other corporate-level managers also report to Davis.  Davis directly oversees and collaborates with corporate-level managers who are responsible for, *inter alia*, (1) creating and modifying Help at Home's "Employee Manual" that is given to Supervisors and other employees when they are hired, (2) processing and managing payroll, (3) legal compliance, risk management, and insurance, and (4) budgeting and financial planning.

*The Role of Davis and the RVPs*

65.     Within each Region, Davis and the RVPs—including Defendants Cantrell and Newbern—on behalf of Help at Home, dictate, control, and ratify all of Help at Home's policies—including policies that pertain to employee compensation—that are uniformly applied to all employees, including Supervisors, within each of the Regions.

66.     First, the RVPs establish uniform hours of operation for all of Help at Home's Branches in a given Region.  For example, Cantrell, Newbern, and Kepper all require Branches in their respective Regions to be open from 8:00 a.m. to 5:00 p.m., with an hour lunch period. Although these hours of operation were implemented before publication of Help at Home's Employee Manual—which was created with oversight from Davis and in collaboration with the RVPs—the Employee Manual also establishes these uniform hours of operation.  Branch Managers do not have the authority to deviate from the uniform hours of operation established by their respective RVPs and Davis.

67.     Second, RVPs must approve all requests from Supervisors to work overtime.[2] Branch Managers do not have the authority to approve overtime requests from Supervisors.

68.     Third, RVPs must approve all hiring decisions made by Branch Managers in their respective Regions, and determine the hourly rate of pay for all of the Supervisors hired or employed at the Branches in their respective Regions.  RVPs routinely confer with Davis with respect to these decisions, on both a large-scale and case-by-case basis.  To demonstrate, the RVPs and Davis jointly established a general pay scale for Supervisors, but RVPs will frequently communicate and seek Davis's approval with respect to deviations from that general pay scale.

___
[2] For clarity, the "overtime" referenced in this paragraph pertains to office work, separate and apart from Supervisors' on-call duties.  Any extra hours worked by a Supervisor while performing on-call duties are handled differently, as described more fully below.

Branch Managers do not have the authority to hire a new employee, or determine any Supervisors' hourly rate of pay, without approval from an RVP.

69. Fourth, RVPs review all timesheets submitted from Supervisors at the Branches in their respective Regions, and must approve those timesheets before they are submitted to Help at Home's payroll personnel. In addition, RVPs have the exclusive power to modify Supervisors' timesheets after they are submitted to payroll, such as in the event that a Supervisor makes an error on his/her timesheet. If a Branch Manager becomes aware of such an error, that Branch Manager must inform the appropriate RVP to make the required correction, and cannot make such a modification own his/her own.

70. Fifth, the RVPs establish uniform methods for compensating Supervisors for working on-call at the Branches within their respective Regions. The RVPs create these on-call compensation methods in conjunction with Davis, and Davis knows of the methods being offered by the RVPs to the Branches within their respective Regions. Branch Managers do not have the authority to deviate from the on-call compensation methods established by their respective RVPs and Davis.

71. Sixth, RVPs must approve all budgetary matters and expenditures made by the Branch Managers at the Branches in their respective Regions. The RVPs collaborate with Davis—who in turn collaborates with other corporate-level managers—with respect to budgetary and financial issues within their respective Regions. Aside from a small fund of "petty cash"— which is generally no more than $100—that Branch Managers can use for discretionary expenditures, Branch Managers must get approval from an RVP to make expenditures.

72. Finally, RVPs are responsible for ensuring that Branches within their respective Regions are operating in compliance with relevant law and Help at Home's policies and procedures—including those established in Help at Home's Employee Manual.

73. In turn, Davis is responsible for ensuring that Help at Home's policies and procedures comply with applicable law, and that RVPs are operating all Branches within their respective Regions in compliance with those policies and applicable law. Indeed, Davis is directly involved in reviewing and approving Help at Home's Employee Manual, as well as other policies and procedures, and ensuring that those policies and procedures are communicated to, and implemented by, the RVPs.

74. Similarly, RVPs are responsible for ensuring that Supervisors and Branch Managers are trained in accordance with Help at Home's policies and procedures, that all employees receive Help at Home's Employee Manual, and that Branch Managers are enforcing those policies and are operating their Branches in compliance with relevant law.

75. To that end, RVPs actively monitor the Branches within their respective Regions to ensure compliance with Help at Home's established policies, such as by (1) routinely traveling to Branches, (2) frequently—oftentimes on a daily basis—communicating with the Branch Managers over the phone, (3) holding routine conference calls with all Branch Managers and other subordinate management-level employees in their respective Regions, (4) attending annual, in-person meetings to discuss operations with the Branch Managers and other subordinate management-level employees in their respective Regions, and (5) annually reviewing the performance of the Branch Managers and other subordinate management-level employees in their respective Regions using forms provided by Help at Home's corporate office. In addition, RVPs have the authority to discipline Supervisors, Branch Managers, and other subordinate

management-level employees for violations of the policies and procedures that RVPs, Davis, and/or Help at Home has established.

76.     In sum, although Branch Managers oversee the day-to-day activities at their respective Branches, Branch Managers have limited autonomy and authority with respect to many aspects of the operations at their respective Branches. Rather, much of that supervisory authority is exercised by the RVPs and Davis, who are the individuals primarily responsible for creating, implementing, and enforcing Help at Home's policies at each of the Branches.

### The Purpose of the FLSA and Other Similar Laws

77.     The FLSA and other similar laws have three goals: (1) "to spread work in order to reduce unemployment," (2) "to discourage…a degree of overtime that might impair workers' health or safety," and (3) "to increase the welfare of low-paid workers." *E.g.*, *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 510 (7th Cir. 2007) (citing *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175-76 (7th Cir. 1987)).

78.     To accomplish these goals, the FLSA and other similar laws put financial pressure on employers to discourage them from requiring overtime work by increasing the labor costs associated with such work—*i.e.*, requiring employees to be paid an overtime premium. *E.g.*, *Nunn's Battery & Elec. Co. v. Goldberg*, 298 F.2d 516, 519 (5th Cir. 1962) ("The operative mechanism of the statute is the differential between the regular rate of pay and the overtime rate, since that is what compensates the employees for their having to work extra hours and that is what penalizes the employer for calling upon them to do so."); *Bumpus v. Cont'l Baking Co.*, 124 F.2d 549, 552 (6th Cir. 1941) ("The imposition on the employer of the increased expense for overtime is intended to discourage the imposition of excessive hours of labor upon the employees."); *Yi*, 480 F.3d at 510.

79.     Most importantly, employers must actually bear the increased costs of overtime work to ensure that the purposes of the FLSA and other similar laws are accomplished.  As such, the FLSA imposes strict limitations on how overtime premiums are to be calculated.  29 U.S.C. § 207(e).  The United States Department of Labor ("DOL") also provides detailed guidance on how those limitations are to be interpreted in almost every situation.  29 CFR § 778.

80.     To that end, the FLSA's strict limitations on the calculation of overtime premiums, and the DOL's interpretive guidance of those limitations, ensure that employers do not engage in gamesmanship to avoid the financial pressures associated with overtime work, and undermine the purpose of the FLSA.  *See generally*, 29 CFR § 778.

81.     For example, even employees paid on a salary basis must be paid overtime premiums for hours in excess of 40, in addition to their salary, so that employers feel the financial pressures associated with overtime work.  *See, e.g.*, 29 CFR § 778.108; 29 CFR § 778.109; 29 CFR § 778.113; 29 CFR § 778.114; 29 CFR § 778.310.  Indeed, "the Congressional purpose to effectuate a maximum hours standard by placing a penalty upon the performance of excessive overtime work would…be defeated" if "an employer desiring to pay an employee a fixed salary regardless of the number of hours worked in excess of the applicable maximum hours standard could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked." *E.g.*, 29 CFR § 778.310.

82.     Given the many opportunities for gamesmanship with respect to the maximum hours provision of the FLSA, the FLSA and the DOL also impose strict recordkeeping requirements on employers.  29 U.S.C. § 211(c); 29 CFR § 516.  These recordkeeping requirements ensure that employers bear the burden of FLSA compliance because accurate

records are necessary to verify that employers did, in fact, comply with the FLSA and other similar laws. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 595 (7th Cir. 2008).

83. Necessarily, the incentive structure established by the FLSA breaks down when employers do not keep accurate records, as it allows employers to avoid the requirements of the FLSA while simultaneously eliminating the best evidence of noncompliance with those requirements. *See*, *Anderson*, 328 U.S. at 687; *Brown*, 534 F.3d at 595.

### *Defendants' Common Policy*

84. In this case, Davis and the RVPs, on behalf of Help at Home, have adopted a *de facto*, unwritten, company-wide policy (the "Policy") whereby Supervisors are forced to falsify their timesheets to diminish or eliminate the number of overtime hours that they worked in a given week.

85. In most instances, the Policy allows Help at Home to pay Supervisors a fixed amount for all the hours that they work, regardless of whether those hours are in excess of 40 per week. Even where Supervisors receive *some* additional compensation for working additional hours, the Policy significantly diminishes the total amount of compensation paid to Supervisors, in violation of the FLSA and other similar laws.

86. As a result, the Policy enables Help at Home to avoid the financial pressures that the FLSA and other wage and hour laws strive to create with respect to overtime work.

87. The Policy also allows Help at Home to avoid compliance with the FLSA's recordkeeping requirements.

88. These recordkeeping violations ensure that the Policy is self-perpetuating because it obscures the true amount of time that Supervisors work, making it more difficult for

Supervisors to identify, challenge, and secure redress for Help at Home's violations of the FLSA and other similar laws.

89.     Davis and the RVPs, on behalf of Help at Home, created and maintained this Policy by implementing structural barriers, establishing procedures, and employing deceptive tactics that they know will cause, and have caused, Supervisors to inaccurately record the time that they worked on their timesheets.  Although the Policy is effectuated by Davis and the RVPs using several different methods, these methods independently, and collectively, violate the FLSA and other similar laws regarding employee compensation, as set forth below.

### The Time Supervisors Work at the Branches

90.     For the hours that Supervisors spend working while physically present at each of the Branches, Supervisors encounter significant pressure to only record that they worked 40 hours per week on their timesheets, regardless of the time they actually worked.

91.     Davis and the RVPs, on behalf of Help at Home, expect that Supervisors accomplish all of their duties during normal office hours—*e.g.*, 8:00 a.m. to 5:00 p.m. with a mandatory hour for lunch—despite the fact that Supervisors cannot accomplish all of those duties within that timeframe.

92.     As such, Supervisors are routinely required to work more than 40 hours per week—*e.g.*, before and after shifts, or during lunch—in order to complete all of their duties.

93.     However, Davis and the RVPs, on behalf of Help at Home, make clear to Branch Managers and other subordinate management-level employees that Supervisors are not to be paid overtime, and therefore, should instruct Supervisors to only record that they worked 40 hours per week on their timesheets, regardless of the time they actually worked.

94.     Davis and the RVPs, on behalf of Help at Home, expect that Branch Managers and other subordinate management-level employees will enforce the mandate that Supervisors should only record that they worked 40 hours per week on their timesheets, so that Supervisors are not recording any overtime hours that they worked.

95.     Due to the conflicting expectations of Davis and the RVPs, as mandated through the Branch Mangers—*i.e.*, that Supervisors complete all of their duties, but should not work overtime to do so—Supervisors have no choice but to inaccurately record the time that they worked on their timesheets in order to keep their jobs.

96.     In addition, Davis and the RVPs, on behalf of Help at Home, require Supervisors to get prior approval from an RVP—and not a Branch Manager—in order to be compensated for overtime.  However, such approvals are rare, as RVPs frequently deny such requests.

97.     The requirement that Supervisors get prior approval for overtime from a high-level manager—*i.e.*, an RVP instead of a Branch Manager—further emphasizes to Supervisors that Davis and the RVPs expect that Supervisors should be able to complete all of their duties during normal office hours, and that overtime work is undesirable, extravagant, and unnecessary.

98.     This impression is bolstered by the fact that RVPs routinely deny Supervisors' requests to work overtime, and, when RVPs review Supervisors' timesheets, the RVPs, or someone delegated by the RVPs, will (1) alter Supervisors' timesheets to unilaterally eliminate unapproved overtime, (2) pester Supervisors anytime overtime is recorded to ensure that it was approved, (3) admonish the Supervisors for recording unapproved overtime and instruct them to change their timesheets, and/or (4) engage in other practices—*e.g.*, giving the Supervisors "comp time," as described more fully below—that modify the amount of compensation that the Supervisors will receive.

99.     In fact, at many Branches, Supervisors are informed if they work outside of the "normal" 40 hour work week, they are considered to be "volunteering" their time, and should not expect to be paid, or to get approval from an RVP to work those overtime hours. This further discourages Supervisors from even asking for approval for overtime, as it gives the impression that Supervisors are working those additional hours voluntarily, such that Help at Home has no obligation to pay Supervisors for that time.

100.     In light of the foregoing, Supervisors believe that they will not be compensated for unapproved overtime, and that they will disciplined if they record hours in excess of 40 per week on their timesheets without approval.

101.     As such, by requiring Supervisors to get prior approval from an RVP—and not a Branch Manager—in order to be compensated for overtime, Davis and the RVPs, on behalf of Help at Home, discourage Supervisors from recording hours in excess of 40 per week on their timesheets.

102.     Moreover, Davis and the RVPs, on behalf of Help at Home, also discourage Supervisors from accurately reporting the time that they worked by uniformly imposing a mandatory, one hour, lunch break at every Branch, and automatically deducting that hour from Supervisors' compensated time if it is not otherwise affirmatively indicated that a Supervisor worked through lunch.

103.     Even in cases where Supervisors affirmatively indicate on their timesheets that they worked through lunch, they are still subjected to the practices described above when the RVPs review their timesheets. This discourages Supervisors from indicating that they worked through lunch, and leads Supervisors to not record this time on their timesheets.

21

104. Therefore, by imposing the automatic lunch deduction, Davis and the RVPs, on behalf of Help at Home, shift the burden to Supervisors to record hours worked during their lunch period, while, for the reasons set forth above, simultaneously discouraging them from reporting this time accurately.

105. Finally, on at least a few instances, Davis and the RVPs, on behalf of Help at Home, were made aware of the fact that Supervisors were performing work that was not being recorded on their timesheets, but did not do anything to address that issue.

106. Accordingly, Supervisors know that Davis and the RVPs, on behalf of Help at Home, intend for them to falsify their timesheets, and that they are powerless to do anything but submit to the Policy as a condition of employment.

107. In sum, Supervisors have no choice but to routinely falsify their timesheets in order to comport with the Policy imposed upon them by Davis and the RVPs, on behalf of Help at Home.

108. Davis and the RVPs, on behalf of Help at Home, know that, by engaging in and enforcing the practices and procedures set forth above, the Policy is being effectuated as intended—*i.e.*, Supervisors have no choice but to falsify their timesheets.

109. As noted above, the Policy, as it applies to Supervisors' office work, allows Help at Home to pay Supervisors a fixed rate per week because it ensures that Supervisors will only record 40 hours per week on their timesheets, and that Supervisors will only be compensated for that time.

110. Similarly, as noted above, the Policy, as it applies to Supervisors' office work, allows Help at Home to avoid the FLSA's recordkeeping requirements, and obscures the true

amount of time that Supervisors worked, making it more difficult for Supervisors to identify, challenge, and secure redress for Help at Home's failure to compensate them appropriately.

*On-Call Time*

111.    As discussed above, in addition to the hours that Supervisors physically spend at Help at Home's Branches, Supervisors at many Branches are required to work on-call during the evenings and weekends.

112.    Generally, on-call duties rotate between Supervisors on a weekly basis—*i.e.*, a Supervisor works on-call for a week, then another Supervisor at the Branch works on-call the next week, and so on.

113.    While on-call, Supervisors are responsible for taking calls directly from clients and caretakers, and checking a voicemail box for messages approximately every 2 hours between the hours of 6:00 a.m. and 10:00 p.m. for messages from clients and caretakers, to handle any issues that may arise while their respective Branches are closed.

114.    Since only one Supervisor at a given Branch is responsible for on-call duties in a given week, that Supervisor handles all issues with respect to every client and caretaker at that Branch, even if that Supervisor does not normally oversee a particular client or caretaker during regular business hours.

115.    If an issue arises while on-call that can be handled during normal office hours by another Supervisor, the Supervisor working on-call is to take detailed notes regarding the issue, and communicate that issue to the appropriate Supervisor the next business day.

116.    However, if an issue arises that needs immediate attention—such as when a client cancels or a caretaker calls in sick—Supervisors must communicate with both clients and caretakers to make the appropriate adjustments—such as finding a substitute caretaker to cover

the shift, or rearranging other caretakers' and clients' schedules to ensure care is provided to all clients.

117.    Generally, it takes Supervisors 1 to 2 hours to address each issue that arises while on-call, but Supervisors may need significantly more time in certain scenarios.

118.    For example, if a caretaker calls in sick and cannot see a client, Supervisors may spend several hours (1) contacting that client to reschedule their appointment, (2) attempting to contact a substitute caretaker, (3) rearranging other caretakers' schedules to accommodate that client, and/or (4) coordinating with other clients to reschedule their appointments.

119.    In addition, Supervisors must also take detailed notes regarding these issues as well, so that they can communicate them to the appropriate Supervisor the next business day, or so that they can address any residual or consequential issues the next time they are personally in the office.

120.    Although Supervisors' on-call duties are substantially similar to the duties they are required to perform while at work, those duties are rendered more demanding when performed on-call.  This is because those duties are being performed outside of normal business hours, which makes it more difficult to contact clients and caretakers, and properly address those issues.  In addition, because Supervisors are handling all issues with respect to every client and caretaker at their Branch, Supervisors encounter an increased volume of potential issues, while also lacking familiarity with the needs and availability of clients and caretakers with whom they do not normally interact during regular business hours.

121.    In some instances, Supervisors working on-call may even be required to personally provide services for Help at Home's clients, if they cannot find a suitable replacement caretaker.

122.    Given the complexity of Supervisors' on-call duties, Supervisors who are on-call are unable to effectively use their time for personal endeavors while away from work.

123.    Indeed, while working on-call, Supervisors need to be constantly available and ready to devote significant time to log and handle any issues that may arise, and cannot travel to locations where they cannot be reached by phone, or attend events that render telephone use or detailed notetaking difficult or impossible.  As such, Supervisors working on-call cannot run errands, consume alcohol or socialize with others, or even leave their houses.

124.    Despite the demands of these on-call shifts, Supervisors are instructed to not record the actual time that they worked while on-call on their timesheets, pursuant to the Policy created and enforced by Davis, and the RVPs, on behalf of Help at Home.

125.    Supervisors record detailed notes while working on-call.

126.    At some Branches, such as the Branch at which Plaintiffs Bush and Phillips worked, Supervisors do not record on-call time on their timesheets because they believe that, both as a legal matter and as a practical matter, on-call time is not compensable at all. As set forth below, Supervisors are not given any training how on-call time is to be recorded on their timesheets, and Help at Home's Employee Manual is devoid of any reference to on-call time or compensation therefor.  As such, Supervisors at these Branches have no reason to question the pervasive assumption that this time is not compensable as a matter of law.

127.    Even if Supervisors at those Branches believe that they should be compensated for on-call time pursuant to applicable law, they know that, as a practical matter, they will not be compensated for this time by Help at Home, and are therefore discouraged from recording it on their timesheets for the same reasons set forth above with respect to overtime worked while in the office.

128. Indeed, on at least a few instances, Davis and the RVPs, on behalf of Help at Home, were made aware of the fact that Supervisors were not recording and being compensated for on-call work, but did not do anything to address that issue.

129. Accordingly, Supervisors know that Davis and the RVPs, on behalf of Help at Home, intend for them to falsify their timesheets with respect to on-call time, and that they are powerless to do anything but submit to the Policy if they want to keep their jobs.

130. At other Branches, Davis and the RVPs, on behalf of Help at Home, have instituted several common compensation methods with respect to on-call shifts that deceive Supervisors into believing that accurately recording the time that they worked on-call is unnecessary.

131. Specifically, Davis and the RVPs, on behalf of Help at Home, have implemented the following compensation methods with respect to Supervisors' on-call shifts: (1) Supervisors are given a fixed sum of money for handling on-call duties, or (2) Supervisors are given "comp time" for handling on-call duties.

132. Although neither of these compensation schemes complies with the FLSA, these methods of compensation deceive Supervisors into believing that they are being appropriately compensated, as they are less transparent than simply forcing Supervisors to not accurately record time spent on-call on their timesheets.

133. To demonstrate, the fixed sum method of compensating Supervisors for performing on-call duties violates the FLSA because that fixed sum remains the same at each Branch regardless of the individual Supervisors' respective hourly rate of pay, and is not an amount paid with respect to hours actually worked. Therefore, that fixed sum does not qualify as premium compensation that can be excluded from the "regular rate" used to determine the

amount of overtime compensation due, and Supervisors receiving this fixed sum for performing on-call duties are not appropriately compensated for performing extra work. 29 U.S.C. § 207(e); 29 CFR § 778.223; 29 CFR § 778.310; 29 CFR § 778.311.

134. Nevertheless, this fixed sum method deceives Supervisors into believing that they are being appropriately compensated for working on-call, such that it is unnecessary to record the actual number of hours that they worked while on-call on their timesheets.

135. Moreover, by paying Supervisors a fixed sum for on-call work and not having Supervisors record this time, Davis and the RVPs, on behalf of Help at Home, further bolster the Policy by demonstrating to Supervisors that it is undesirable, extravagant, and unnecessary for Supervisors to accurately record hours in excess of 40 on their timesheets.

136. Davis and the RVPs, on behalf of Help at Home, are aware that this fixed sum method of on-call compensation violates the law, as the United States Department of Labor ("DOL") investigated Help at Home with respect to that method of on-call compensation in 2014, and determined that Help at Home had violated the FLSA. During that investigation, the DOL corresponded with Davis and informed him that Help at Home's fixed sum method of on-call compensation violated the FLSA. Nevertheless, Help at Home did not change its on-call compensation practices.

137. Similarly, Help at Home's "comp time" method also effectuates the Policy and leads to violations of the FLSA and other similar laws.

138. Under the "comp time" method, Supervisors are supposed to be given time off—during normal office hours—on a one-to-one ratio for the time they work on-call, such that they are not working any additional hours over 40 per week.

27

139.    However, in some instances, this "comp time" is given *before* the Supervisor actually completes her on-call duties for a given week, making it impossible to predict whether the "comp time" given actually accounts for the correct number of hours.  This renders accurate recording of time on Supervisors' timesheets even more cumbersome, and leads them to falsify their timesheets pursuant to the Policy.

140.    In addition, when "comp time" is awarded in this fashion, Supervisors are instructed to only record the number of "comp time" hours they were awarded on their timesheets, and *not* the number of hours that they actually worked while on-call.  Accordingly, this also causes Supervisors to falsify their timesheets, pursuant to the Policy.

141.    Moreover, as noted above, on-call duties are so extensive and time consuming that the limited number of "comp time" hours Supervisors are permitted to utilize does not nearly account for the actual time that Supervisors spend working on-call.

142.    By awarding "comp time" *before* Supervisors actually complete their on-call duties in a given week, Davis and the RVPs, on behalf of Help at Home, create another structural barrier that prevents Supervisors from accurately reporting the time they worked while on-call, which further effectuates the Policy.  This is in conjunction with the fact that, for the same reasons set forth above with respect to recording time spent while in the office, Supervisors know that, as a practical matter, they will not be compensated by Help at Home for on-call time that exceeds the amount of "comp time" they were awarded, and are therefore discouraged from recording it on their timesheets.

143.    Even in scenarios where Supervisors do report that the time they spent working on-call exceeded the amount of "comp time" they were given, Davis and the RVPs, on behalf of Help at Home, require Supervisors to report this extra time to their Branch Managers, orally, and

28

then Branch Managers are to award Supervisors additional "comp time" during a different week in the future. This additional "comp time" is not paid as overtime in a different week. Rather, Supervisors are permitted to take off during normal office hours and use this "comp time" to be paid for those hours that they have not actually worked, similar to vacation time.

144. Again, this deceives Supervisors into believing that they are being appropriately compensated for working on-call, and affirmative tells them that it is unnecessary to record the actual number of hours that they worked while on-call on their timesheets.

145. Moreover, allowing Supervisors to use "comp time" to cover normal office hours in other weeks, Davis and the RVPs, on behalf of Help at Home, further bolster the Policy by making clear to Supervisors that overtime hours are not to be accurately recorded, and the only hours that should be recorded are those that occur during normal office hours.

146. Similarly, by allowing Supervisors to utilize that additional "comp time" to cover time off during office hours at a different week in the future, Davis and the RVPs, on behalf of Help at Home, make a clear statement that Supervisors are not to be paid overtime, and that all compensation will be paid at the Supervisors' normal hourly rate, even if it requires further falsification of Supervisors' timesheets.

147. At other Branches, "comp time" may not be awarded *before* a Supervisor actually completes her on-call duties for a given week, but rather, is accrued over the span of many weeks, similar to the way that Supervisors accrue vacation or sick time. Supervisors then are permitted to take time off work in other weeks—during normal office hours—and use their accrued "comp time" to receive compensation.

148. In addition, as noted above, "comp time" can also be awarded in other instances, such as where a Supervisor works extra hours in the office, or covers a caretaker's in-home shift.

149.     Nevertheless, although "comp time" may be awarded in a different fashion or for different reasons at some Branches, all of the foregoing reasons as to how "comp time" causes Supervisors to falsify their timesheets apply.

150.     Importantly, this "comp time" method violates the FLSA and other similar laws because it allows Help at Home to compensate Supervisors at their normal hourly rate, instead of at a premium rate, and because Supervisors do not timely receive any compensation for this extra time.  29 CFR § 778.106 ("The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends."); *see also*, *Nolan v. City of Chicago*, 162 F.Supp.2d 999, 1004 (N.D. Ill. 2001) (collecting cases).

151.     In addition, since "comp time" was not recorded in writing, Supervisors would sometimes not be able to use that time at a later date, and would thus never be compensated for that time at all.

152.     In sum, each of the aforementioned compensation methods with respect to Supervisors' on-call time (or other extra time worked while in the office) effectuates the Policy imposed upon them by Davis and the RVPs, on behalf of Help at Home, because it leaves Supervisors with no choice other than to routinely falsify their timesheets.

153.     Davis and the RVPs, on behalf of Help at Home, know that, by engaging in and enforcing the practices and procedures set forth above, the Policy is being effectuated as intended—*i.e.*, Supervisors have no choice but to falsify their timesheets.  In fact, these practices affirmatively *require* Supervisors to falsify their timesheets.

154.     As noted above, the Policy, as it applies to Supervisors' on-call time, allows Help at Home to pay Supervisors a fixed rate per week because it ensures that Supervisors will only record 40 hours per week on their timesheets, and that Supervisors will only be compensated for

that time—or in the case of the flat rate method for on-call time, a small amount more that is unrelated to the hours that they actually worked. Indeed, even in cases where on-call duties rotate between the Supervisors at a given Branch, and Supervisors are compensated using the fixed rate method, Help at Home can ensure that the same, fixed amount of compensation is being paid to Supervisors in aggregate, because the fixed rate is the same for whichever Supervisor at that Branch is working on-call.

155.    Similarly, as noted above, the Policy, as it applies to Supervisors' on-call time, allows Help at Home to avoid the FLSA's recordkeeping requirements, and obscures the true amount of time that Supervisors worked, making it more difficult for Supervisors to identify, challenge, and secure redress for Help at Home's failure to compensate them appropriately. In fact, the methods of on-call compensation actually deceive Supervisors into believing that they are being compensated appropriately, when in fact they are not.

*The Lack of Training, Corrective Action, and Authority*

156.    Pursuant to 29 CFR § 785.13, Davis and the RVPs, on behalf of Help at Home, have a duty to exercise their authority and control over the Branches to ensure that Supervisors are not performing uncompensated work and that their timesheets are accurate. Indeed, "the mere promulgation of a rule against [uncompensated] work is not enough. Management has the power to enforce the rule and must make every effort to do so." 29 CFR § 785.13.

157.    The managerial duties articulated by 29 CFR § 785.13 are specifically intended to prevent management, such as Davis and the RVPs, from "sit[ting] back and accept[ing] the benefits" of work "without compensating for them."

158.    However, Davis and the RVPs abdicate their collective managerial responsibility to ensure that Help at Home keeps accurate records and that Supervisors are properly compensated for all the hours that they work.

159.    Davis's and the RVPs' failure to exercise that managerial responsibility is not the result of neglect or lack of knowledge that such failures are occurring.  Rather, the Policy, and the particular manifestations thereof, are expressly mandated by Davis and the RVPs, and Branch Managers and other subordinate management-level employees are required to enforce it.

160.    Indeed, RVPs routinely discuss different aspects of the Policy with Branch Managers and other subordinate management-level employees, and make clear that they cannot deviate from the Policy.

161.    At all times relevant to this action, Davis and the RVPs knew the effect of the Policy on Supervisors, but did nothing to stop it.  Even after the onset of this litigation and the DOL investigation discussed above, Davis and the RVPs have continued to allow the Policy to exist, and have made no changes that would indicate anything but their explicit approval of the Policy.

162.    As such, Davis's and the RVPs' actions, or lack thereof, are inconsistent with anything other than a concerted effort to ensure that the Policy was implemented and enforced.

163.    In addition, Davis and the RVPs, on behalf of Help at Home, have undertaken purposeful and intentional steps to ensure that the Policy has its intended effect and will not be challenged—*i.e.*, that Supervisors are forced to falsify their timesheets so that they are undercompensated.

164.    One specific way in which Davis and the RVPs, on behalf of Help at Home, ensure that the Policy is implemented is by creating structural barriers that leave Branch Managers and Supervisors with no choice other than to submit to the Policy.

165.    For example, Davis and the RVPs require Supervisors to get prior approval from an RVP to work overtime, but do not allow Supervisors to do so directly. Rather, Supervisors are required to ask their Branch Managers to seek approval from the RVPs on the Supervisors' behalf.

166.    By requiring RVPs to approve all overtime, and not allowing Branch Managers to do so, Davis and the RVPs make it extremely cumbersome for Supervisors to secure the requested approval, and further discourage Supervisors from even asking in the first place. This is in conjunction with the other reasons Supervisors are discouraged from accurately reporting overtime articulated above.

167.    Similarly, by giving Branch Managers extremely limited authority to manage their respective Branches with respect to budgetary, compensation, personnel, and operational issues, while still holding Branch Managers accountable for the performance of their Branches, Davis and the RVPs ensure than Branch Managers have no option other than to enforce the Policy on Supervisors.

168.    RVPs make clear to Branch Managers and other subordinate management-level employees that they are required to enforce the Policy. For example, Cantrell has yelled at, and threatened to fire, subordinate management-level employees that he believed were not, or would not, comply with his directives.

169.    As such, Branch Managers are disincentivized from advocating on Supervisors' behalf for approval to work overtime, while also being incentivized to pressure or allow Supervisors to work unapproved overtime to accomplish their job duties.

170.    Indeed, by establishing a structure wherein Branch Managers are expected to manage the day-to-day operations of their respective Branches, but limiting Branch Managers' actual ability and discretion to do so, Davis and the RVPs ensure that Branch Managers have no choice but to allow Supervisors to falsify their timesheets, and allow the Policy to proliferate.

171.    To be clear, Branch Managers are not exercising individualized discretion to direct and permit Supervisors to work overtime without recording that time on their timesheets. To the contrary, Branch Managers lack the authority and incentives to ensure that Supervisors are being compensated appropriately and recording their time properly, and are merely implementing the Policy as directed by Davis and the RVPs.

172.    Moreover, the Policy is not some unintended consequence of the aforementioned vacuum of authority that was implemented by Branch Managers due to Davis's and the RVPs' neglect and lack of knowledge.  Even if this was the cause of the Policy, it would still be due to Davis's and the RVPs' dereliction of the duties imposed by 29 CFR § 785.13.

173.    Indeed, the lack of any observable countermeasures, training, or remedial actions undertaken by Davis and the RVPs, on behalf of Help at Home, indicates that they clearly intended for this vacuum of authority to result in the implementation of, and acquiescence to, the Policy.

174.    Put another way, even if Davis and the RVPs did not explicitly create, enforce, and condone the Policy, they should, could, and would have enacted other policies and procedures that would have prevented it from ever being implemented.  But, even after the onset

of this litigation, Davis and the RVPs have not adopted countermeasures that would indicate their disapproval of the Policy. In fact, the exact opposite has occurred—Davis and the RVPs have further implemented many of the improper practices complained of at other Branches.

175. Consistent with their specific intent that the Policy be enforced, Davis and the RVPs refuse to provide adequate training to Branch Managers and Supervisors, and do not take any remedial actions, that would give Branch Managers and Supervisors any indication that the Policy should not be followed.

176. For example, Supervisors are never given any indication or training that they are to complete their timesheets accurately, as Help at Home's Employee Manual—which is the only training material Supervisors receive—is devoid of specific instructions as to how to complete a timesheet accurately, any affirmations that timesheets should include all time worked, or any statements condoning overtime work. Help at Home's Employee Manual is also devoid of any instructions with respect to recording or being compensated for on-call work.

177. Similarly, Davis and the RVPs ensure that Branch Managers are not given adequate training or affirmative guidance that would contravene the Policy—*e.g.*, Branch Managers are not trained to abide by the provisions of the FLSA or other similar laws, and are given no other training materials that reference Help at Home's compensation policies other than the Employee Manual.

178. Davis and the RVPs also fail to train or inform Branch Managers that they have authority to do anything other than enforce the Policy, and specifically instruct them to abide by, and enforce, the Policy.

179. As such, Branch Managers are led to believe and accept that the Policy is permissible, and are unaware that they should be doing anything other than enforcing the Policy.

180.    Moreover, even if Branch Managers know that the Policy is illegal, and that Supervisors are not being compensated appropriately, they are trained to believe that they are powerless to stop it.  This belief is bolstered, and proven to be accurate, by the fact that Branch Managers have limited authority to manage employee compensation issues, and because the RVPs wield all of this authority.

181.    Branch Managers also have no reason to think that Davis and the RVPs would even be receptive to changing the Policy.  In fact, as discussed above, Davis and the RVPs created, communicated, and enforced the Policy, and even though they know that Supervisors are performing work that was not being recorded on their timesheets, they have done nothing to change the Policy.

182.    Indeed, some Branch Managers have refrained from adopting policy changes that would more adequately compensate Supervisors precisely because they believed that doing so would run afoul of the directives given to them by Davis and the RVPs, and that they would be disciplined or fired for doing so.

183.    In addition, Davis and the RVPs require Branch Managers to train Supervisors when they are hired, and exclusively instruct Supervisors as to how to complete their timesheets—indeed, Help at Home's Employee Manual gives no guidance with respect to completing timesheets other than stating that Supervisors should follow the instructions of their Branch Managers.

184.    By refusing to give Branch Managers any guidance, training, or authority that would cause Branch Managers to instruct Supervisors to fill out their timesheets appropriately, Davis and the RVPs further ensure that new Supervisors are immediately subjected to the Policy upon being hired.  In fact, some Branch Managers instruct Supervisors from the day that they are

hired to not expect to be paid for any overtime hours, as Branch Managers have no authority to deviate from the Policy.

185.     Accordingly, Branch Managers and Supervisors, out of fear for the safety of their jobs, and in compliance with the mandates of Davis and the RVPs, are further discouraged from questioning or challenging the Policy, or taking any measures that would contravene the Policy.

186.     Davis's and the RVPs' intent is also reflected by the fact that they instruct Branch Managers and Supervisors to engage in activities that shield the Policy from being challenged, and deceive Branch Managers and Supervisors into believing that the Policy complies with the law.

187.     As discussed above, the FLSA imposes recordkeeping requirements on employers so that compliance with the law can be easily verified. *Anderson*, 328 U.S. at 687; *Brown*, 534 F.3d at 595.

188.     However, by forcing Supervisors to falsify their timesheets, Davis and the RVPs ensure that there are no accurate records that can be used to evidence the true scope and effects of the Policy.

189.     Similarly, by employing deceptive compensation tactics like a flat rate for on-call time, or authorizing Branch Managers to award "comp time," Supervisors are further prevented from creating records that can prove that they were undercompensated.

190.     Even where Supervisors do create records to demonstrate the amount of time they work, such as the notes they are required to take while performing on-call duties, Supervisors are often instructed to destroy those notes, so that there are no records to prove how much time they actually worked.

191.    Taken in conjunction with one another, all of Davis's and the RVPs' intentional and purposeful actions, or the lack thereof, ensure that the Policy is self-perpetuating because those actions, and the lack thereof, lead Branch Managers and Supervisors to correctly believe that the Policy cannot, and will not, be changed, and is explicitly endorsed by Davis and the RVPs, on behalf of Help at Home.

192.    Similarly, the Policy obscures the true amount of time that Supervisors work, and make it more difficult for Supervisors to identify, challenge, and secure redress for Help at Home's violations of the FLSA and other similar laws regarding employee compensation. This allows the Policy to be shielded from being challenged, and further perpetuates the Policy.

193.    Most importantly, the sheer pervasiveness of the Policy indicates that it is not the result of any isolated, individualized discretion, or the lack of adequate training or knowledge on the part of any one specific Branch Manager or Supervisor. Rather, the Policy is the result of a common scheme devised by Davis and the RVPs with the specific purpose of ensuring that Supervisors are forced to falsify their timesheets. Indeed, the practices complained of occur at most, if not all, of Help at Home's Branches.

194.    In sum, by (1) requiring Branch Managers and Supervisors to comply with the directives set forth above, (2) limiting the authority and ability of Branch Managers and Supervisors to deviate from those directives, (3) failing to take corrective action and provide training intended to rectify the effect of those directives—*i.e.*, Supervisors falsifying their timesheets and being undercompensated, (4) actively engaging in conduct that bolsters the effect of those directives on Supervisors, and (5) destroying or altering records that would allow Supervisors to challenge those directives, Davis and the RVPs, on behalf of Help at Home, ensure that the Policy is implemented, enforced, and perpetuated.

195.    Although Davis and the RVPs explicitly promulgate and enforce the Policy, the foregoing acts and omissions ensure that even in the absence of any explicit directive from Davis and the RVPs to Branch Managers and Supervisors that Supervisors should falsify their timesheets, the Policy will be enforced.  This is because, as set forth above, Davis and the RVPs, on behalf of Help at Home, create the necessary conditions precedent for the existence of the Policy, and then actively engage, and fail to engage, in conduct that would be inconsistent with any intent other than to ensure that the Policy is enforced.

196.    To be clear, the fact that Davis and the RVPs are not *required* to issue such an explicit directive does not mean that they have not done so.  Indeed, Davis and the RVPs—in particular Cantrell, Newbern, and Kepper—have done just that.  But, even if they have not done so, the other directives articulated above, combined with their collective inaction and (at best) tacit approval of the effects of those directives, ensures that the Policy will be implemented even in the absence of any explicit instruction to enforce the Policy.

197.    In light of the foregoing, Davis and the RVPs, on behalf of Help at Home, have failed to exercise the managerial responsibilities required by 29 CFR § 785.13, and have actively implemented barriers that prevent others from filling that void, precisely so that they can "sit back and accept the benefits" of uncompensated work.

### The Effect of Help at Home's Uniform Policy

198.    Due to the (1) work obligations and expectations placed upon Supervisors, (2) uniform directives, policies, and structural barriers that are enforced on Branch Managers and Supervisors, (3) lack of effective training, responsiveness, and corrective action, and (4) other deceptive, misleading, and coercive tactics discussed above, Davis and the RVPs, on behalf of

39

Help at Home, ensured that the Policy was, and continues to be, enforced on Supervisors, and that Supervisors had, and continue to have, no choice but to submit to the Policy.

199.     Accordingly, all Supervisors, including Plaintiffs, were, and continue to be, subject to Help at Home's uniform Policy—which was created, implemented, and continues to be enforced by Davis and the RVPs.

200.     As a result of the Policy, Supervisors routinely falsified, and continue to falsify, their timesheets, and were routinely undercompensated, and continue to be undercompensated, for the time they spend working for Help at Home.

201.     Due to the effects of the Policy, Plaintiffs, and all other Supervisors, have suffered damages under the FLSA and other similar laws pertaining to employee compensation.   In addition, all Supervisors currently working for Help at Home, and those that will work for Help at Home in the future, will continue to suffer these damages as a result of the Policy.

202.     Davis and the RVPs, on behalf of Help at Home, were, and are, aware of their obligations to appropriately compensate Plaintiffs and all other Supervisors, but willfully engaged, and continue to engage, in the conduct described herein to ensure that Supervisors, including Plaintiffs, were not, and continue to not be, adequately compensated for all the hours that they worked.

## FACTS RELEVANT TO PLAINTIFFS

### *Jennifer Phillips and Tonya Bush*

203.     Plaintiff Phillips began working for Help at Home at Help at Home's Dixon Branch—which was within Cantrell's Region in Illinois—in or about 2008, and stopped working for Help at Home in or about August 2015.

204. Phillips was employed as a Supervisor with respect to PC services at the Dixon Branch in Illinois from 2012 to 2015. As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Phillips when she was a Supervisor.

205. While Phillips was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

206. Phillips routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Phillips did not record that time on her timesheet.

207. As a result, Phillips was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

208. While Phillips was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

209. Phillips routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Phillips did not record that time on her timesheet.

210. As a result, Phillips was not compensated for any of the hours she spent working while on-call.

211. Moreover, Phillips did not receive any flat rate or "comp time" in exchange for working on-call.

212. Plaintiff Bush began working for Help at Home at Help at Home's Dixon Branch—which was within Cantrell's Region in Illinois—in or about June 2014, and stopped working for Help at Home in or about March 2015.

41

213.    Bush was employed as a Supervisor with respect to PC services at her Branch in Illinois for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Bush when she was a Supervisor.

214.    While Bush was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

215.    Bush routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Bush did not record that time on her timesheet.

216.    As a result, Bush was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

217.    While Bush was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

218.    Bush routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Bush did not record that time on her timesheet.

219.    As a result, Bush was not compensated for any of the hours she spent working while on-call.

220.    Moreover, Bush did not receive any flat rate or "comp time" in exchange for working on-call.

221.    During their respective terms of employment, Phillips and Bush repeatedly complained to their Branch Manager about the Policy.  Their Branch Manager informed them that Cantrell had created the Policy, and that Cantrell would not allow her to change the Policy.

222.     Accordingly, Phillips and Bush complained to Cantrell about the Policy on multiple occasions.  However, Cantrell did nothing to address Phillips's and Bush's complaints.

*Sabrina Owens*

223.     Plaintiff Owens began working for Help at Home at Help at Home's South Bend Branch—which was within Cantrell's Region in Indiana—in or about January 2009.

224.     In or about November 2011, Owens was transferred to Help at Home's Plymouth Branch—which was also within Cantrell's Region in Indiana—where she worked until she was transferred back to Help at Home's South Bend Branch in or about July 2015.

225.     Thereafter, Owens remained employed at Help at Home's South Bend Branch until she stopped working for Help at Home in or about July 2016.

226.     Owens was employed as a Supervisor with respect to PC services for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Owens when she was a Supervisor.

227.     While Owens was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above—at both the South Bend Branch and the Plymouth Branch—with respect to hours she worked while in the office.

228.     Owens routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Owens did not record that time on her timesheet.

229.     As a result, Owens was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

230.    While Owens was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above—at both the South Bend Branch and the Plymouth Branch —with respect to the on-call shifts she was frequently required to work.

231.    Owens routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Owens did not record that time on her timesheet.

232.    Moreover, Owens only received a flat rate of approximately $100, which was given to her irrespective of the hours she actually worked while on-call.

233.    As a result, Owens was not appropriately compensated for any of the hours she spent working while on-call.

234.    Owens was also awarded "comp time" when she was required to attend "in-service" meetings.  Those in-service meetings occurred approximately every 3 months, and were held at times outside of normal office hours.  As such, the time Owens spent working during in-service meetings was in excess of the traditional 40 hours she worked in a given week. However, pursuant to the Policy, Owens did not record this "comp time" on her timesheet.

235.    When Owens was awarded "comp time" in exchange for attending in-service meetings, she was not compensated, at all, for the hours she spent at in-service meetings during the particular weeks in which she attended those in-service meetings.  Rather, Owens was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

236.    Accordingly, Owens did not timely receive any compensation for the hours she worked in exchange for "comp time," and in several instances did not receive any compensation at all because she was not able to use the "comp time" at a later date.  Moreover, even when

Owens was able to eventually use that "comp time," Owens was not paid the proper overtime rate because that "comp time" replaced ordinary office hours that were paid at her hourly rate.

237.    When Owens began working for Defendants at Help at Home's South Bend Branch, she spoke with other co-workers on several occasions about the Policy and the fact that all Supervisors were not being appropriately compensated because of the Policy.  Each of those conversations resulted in Owens and her co-workers agreeing that there was nothing they could do to change the Policy, and that challenging the Policy would put their jobs at risk.

238.    Owens encountered similar issues while she worked at Help at Home's Plymouth Branch.  She, and the other Supervisors, knew that it was futile to ask for any extra compensation for time worked outside of the normal 40 hour workweek, and while on-call.

### *Katrina Collinge*

239.    Plaintiff Collinge began working for Help at Home at Help at Home's Lafayette Branch—which was within Cantrell's Region in Indiana—in or about November 2014, and stopped working for Help at Home in or about October 2016.

240.    Collinge was employed as a Supervisor with respect to PC services at her Branch in Indiana for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Collinge when she was a Supervisor.

241.    While Collinge was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

242.    Collinge routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Collinge did not record that time on her timesheet.

243.    As a result, Collinge was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

244.    While Collinge was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

245.    Collinge routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Collinge did not record that time on her timesheet.

246.    In fact, Collinge was required to perform caretakers' duties on weekends when she was unable to find a replacement caretaker to service a client.  However, due to the Policy, Collinge did not record that time on her timesheet.

247.    Moreover, Collinge only received a flat rate of approximately $100, which was given to her irrespective of the hours she actually worked while on-call.

248.    As a result, Collinge was not appropriately compensated for any of the hours she spent working while on-call.

249.    Occasionally, Collinge was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.  However, pursuant to the Policy, Collinge did not record this "comp time" on her timesheet.  Rather, Collinge was required to keep "mental notes" as to how much "comp time" she had accrued.

250.    When Collinge was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned.  Rather, Collinge was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

251.     Accordingly, Collinge did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Collinge was not paid the proper overtime rate.

252.     While she was employed by Defendants, Collinge repeatedly complained to her Branch Manager and other co-workers about the Policy.  Each time, Collinge was informed that Cantrell had created the Policy and that the Policy could not be changed.

### *Kimberly Niles and Amanda Felgar*

253.     Plaintiff Niles began working for Help at Home at Help at Home's Galesburg Branch—which was within Cantrell's Region in Illinois—in or about November 2012, and stopped working for Help at Home in or about December 2014.

254.     Niles was employed as a Supervisor with respect to PC services at the Galesburg Branch in Illinois from 2012 to 2014.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Niles when she was a Supervisor.

255.     While Niles was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

256.     Niles routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Niles did not record that time on her timesheet.

257.     As a result, Niles was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

258.     While Niles was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

259. Niles routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Niles did not record that time on her timesheet.

260. Moreover, Niles only received a flat rate of approximately $50, which was given to her irrespective of the hours she actually worked while on-call.

261. As a result, Niles was not appropriately compensated for any of the hours she spent working while on-call.

262. Occasionally, Niles was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.

263. When Niles was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned. Rather, Niles was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

264. Accordingly, Niles did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Niles was not paid the proper overtime rate.

265. Plaintiff Felgar began working for Help at Home at Help at Home's Galesburg Branch—which was within Cantrell's Region in Illinois—in or about August 2013, and stopped working for Help at Home in or about December 2017.

266. Felgar was employed as a Supervisor with respect to PC services at her Branch in Illinois from January 2015 to December 2017. As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Felgar when she was a Supervisor.

267. While Felgar was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

48

268.    Felgar routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Felgar was not appropriately compensated for the hours she spent working while at the office that exceeded 40 hours per week.

269.    While Felgar was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

270.    Felgar routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Felgar did not record that time on her timesheet.

271.    Moreover, Felgar only received a flat rate of $50, which was given to her irrespective of the hours she actually worked while on-call.

272.    As a result, Felgar was not appropriately compensated for any of the hours she spent working while on-call.

273.    Occasionally, Felgar was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.

274.    When Felgar was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned. Rather, Felgar was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

275.    Accordingly, Felgar did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Felgar was not paid the proper overtime rate.

276.     Niles' and Felgar's Branch Manager informed them that Cantrell had created the Policy and that Cantrell would not allow her to change the Policy.

*Deborah Haverkamp*

277.     Plaintiff Haverkamp began working for Help at Home at Help at Home's Metropolis Branch—which was within Newbern's Region in Illinois—in or about June 2011, and stopped working for Help at Home in or about March 2018.

278.     Haverkamp was employed as a Supervisor with respect to PC services at her Branch in Illinois for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Newbern were joint employers of Plaintiff Haverkamp when she was a Supervisor.

279.     While Haverkamp was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

280.     Haverkamp routinely worked more than 40 hours per week in the office— including before and after shifts, and during lunch—but as a result of the Policy, Haverkamp did not record that time on her timesheet.

281.     As a result, Haverkamp was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

282.     While Haverkamp was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

283.     Haverkamp routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Haverkamp did not record that time on her timesheet.

284.    Moreover, from until approximately 2016, Haverkamp did not receive any flat rate in exchange for working on-call.  Beginning in approximately 2016, Haverkamp only received a flat rate of $100, which was given to her irrespective of the hours she actually worked while on-call.

285.    As a result, Haverkamp was not appropriately compensated for any of the hours she spent working while on-call.

286.    Occasionally, Haverkamp was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.  However, pursuant to the Policy, Haverkamp did not record this "comp time" on her timesheet.

287.    When Haverkamp was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned.  Rather, Haverkamp was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

288.    While she was employed by Defendants, Haverkamp repeatedly complained to her Branch Manager and other co-workers about the Policy.  Each time, Haverkamp was informed that Newbern had created the Policy and that the Policy could not be changed.

### *Kim Ward and Tamatha Cheatham*

289.    Plaintiff Ward began working for Help at Home at Help at Home's Marion Branch—which was within Newbern's Region in Illinois—in or about 2010 to approximately 2011, and began working for Help at Home again in or about 2015, and stopped working for Help at Home in or about April 2018.

290.    Ward was employed as a Supervisor with respect to PC services at the Marion Branch in Illinois from 2015 to April 2018. As set forth above, Help at Home, Davis, and Newbern were joint employers of Plaintiff Ward when she was a Supervisor.

291.    Since Ward was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

292.    Ward routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Ward did not record that time on her timesheet.

293.    As a result, Ward was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

294.    While Ward was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

295.    Ward routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Ward did not record that time on her timesheet.

296.    Moreover, until approximately late 2016, Ward did not receive any flat rate in exchange for working on-call. Starting in approximately late 2016, Ward only received a flat rate of $100, which is given to her irrespective of the hours she actually worked while on-call.

297.    As a result, Ward is not appropriately compensated for any of the hours she spends working while on-call.

298.    Plaintiff Cheatham began working for Help at Home at Help at Home's Marion Branch—which was within Newbern's Region in Illinois—in or about 2014, and stopped working for Help at Home in or about 2017.

52

299.    Cheatham was employed as a Supervisor with respect to PC services at her Branch in Illinois for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Newbern were joint employers of Plaintiff Cheatham when she was a Supervisor.

300.    While Cheatham was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

301.    Cheatham routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Cheatham did not record that time on her timesheet.

302.    As a result, Cheatham was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

303.    While Cheatham was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

304.    Cheatham routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Cheatham did not record that time on her timesheet.

305.    Moreover, until approximately late 2016, Cheatham did not receive any flat rate in exchange for working on-call.  Starting in approximately late 2016, Cheatham only received a flat rate of $100, which is given to her irrespective of the hours she actually worked while on-call.

306.    As a result, Cheatham was not appropriately compensated for any of the hours she spent working while on-call.

307.    During their respective terms of employment, Ward and Cheatham repeatedly complained to their Branch Manager about the Policy.  Their Branch Manager informed them that Newbern had created the Policy and that Newbern would not allow her to change the Policy.

### *Helima Woodland*

308.    Plaintiff Woodland began working for Help at Home at Help at Home's Merrillville/Schererville Branch—which was within Cantrell's Region in Indiana—in or about 2008, and stopped working for Help at Home in or about 2017.

309.    Woodland was employed as a Supervisor with respect to DD services at her Branch in Indiana beginning in March 2013, and continuing the rest of the time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Woodland when she was a Supervisor.

310.    While Woodland was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

311.    Woodland routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Woodland did not record that time on her timesheet.

312.    As a result, Woodland was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

313.    While Woodland was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

314.    Woodland routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Woodland did not record that time on her timesheet.

315.    In fact, Woodland was required to perform caretakers' duties on weekends when she was unable to find a replacement caretaker to service a client.  However, due to the Policy, Woodland did not record that time on her timesheet.

316.    Moreover, Woodland only received a flat fee, which was given to her irrespective of the hours she actually worked while on-call.

317.    As a result, Woodland was not appropriately compensated for any of the hours she spent working while on-call.

318.    Occasionally, Woodland was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.

319.    When Woodland was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned.  Rather, Woodland was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

320.    Accordingly, Woodland did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Woodland was not paid the proper overtime rate.

321.    While she was employed by Defendants, Woodland repeatedly complained to her Branch Manager and other co-workers about the Policy.  Each time, Woodland was informed that Cantrell had created the Policy and that the Policy could not be changed.

### *Whitney Judson*

322.    Plaintiff Judson began working for Help at Home at Help at Home's Springfield Branch—which was within Newbern's Region in Illinois—in or about June 2014, and stopped working for Help at Home in or about March 2016.

323.     Judson was employed as a Supervisor with respect to PC services at her Branch in Illinois for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Newbern were joint employers of Plaintiff Judson when she was a Supervisor.

324.     While Judson was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

325.     Judson routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Judson was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

326.     While Judson was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

327.     Judson routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Judson did not record that time on her timesheet.

328.     Moreover, Judson did not receive any flat rate in exchange for working on-call.

329.     As a result, Judson was not compensated for any of the hours she spent working while on-call.

330.     Occasionally, Judson was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.  However, pursuant to the Policy, Judson did not record this "comp time" on her timesheet.

331.     When Judson was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned.

Rather, Judson was permitted to take time off work—during normal office hours—in other weeks, and use her accrued "comp time" to receive compensation for that time.

332.    Accordingly, Judson did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Judson was not paid the proper overtime rate.

333.    While she was employed by Defendants, Judson repeatedly complained to her Branch Manager and other co-workers about the Policy.  Each time, Judson was informed that Newbern had created the Policy and that the Policy could not be changed.

*Kim Mays*

334.    Plaintiff Mays began working for Help at Home at Help at Home's Terre Haute Branch—which was within Cantrell's Region in Indiana—in or about November 2015, and stopped working for Help at Home in or about November 2016.

335.    Mays was employed as a Supervisor with respect to DD services at her Branch in Indiana for the entire time she was employed by Defendants.  As set forth above, Help at Home, Davis, and Cantrell were joint employers of Plaintiff Mays when she was a Supervisor.

336.    While Mays was employed by Defendants as a Supervisor, she was subjected to the Policy articulated above with respect to hours she worked while in the office.

337.    Mays routinely worked more than 40 hours per week in the office—including before and after shifts, and during lunch—but as a result of the Policy, Mays did not record that time on her timesheet.

338.    As a result, Mays was not compensated for the hours she spent working while at the office that exceeded 40 hours per week.

339.    While Mays was employed by Defendants as a Supervisor, she was also subjected to the Policy articulated above with respect to the on-call shifts she was frequently required to work.

340.    Mays routinely spent significant time working on Defendants' behalf while on-call, but as a result of the Policy, Mays did not record that time on her timesheet.

341.    In fact, Mays was required to perform caretakers' duties on weekends when she was unable to find a replacement caretaker to service a client.  However, due to the Policy, Mays did not record that time on her timesheet.

342.    Moreover, Mays only received a flat rate of $50, which was given to her irrespective of the hours she actually worked while on-call.

343.    As a result, Mays was not appropriately compensated for any of the hours she spent working while on-call.

344.    Occasionally, Mays was awarded "comp time" for additional hours she worked for Defendants in excess of 40 per week.  However, pursuant to the Policy, Mays did not record this "comp time" on her timesheet.  Rather, Mays was required to keep "mental notes" as to how much "comp time" she had accrued.

345.    When Mays was awarded "comp time" she was not compensated, at all, for the hours she worked to earn that "comp time" during that particular week in which it was earned. Rather, Mays was permitted to take time off work—during normal office hours—and use her accrued "comp time" to receive compensation for that time.

346.    Accordingly, Mays did not timely receive any compensation for the hours she worked in exchange for "comp time," and even when she eventually used the "comp time," Mays was not paid the proper overtime rate.

347.    While she was employed by Defendants, Mays repeatedly complained to her Branch Manager and other co-workers about the Policy.  Each time, Mays was informed that Cantrell had created the Policy and that the Policy could not be changed.

## FLSA COLLECTIVE ACTION ALLEGATIONS

348.    Plaintiffs bring their FLSA claims as part of a nationwide Collective Action on behalf of themselves and all other similarly situated employees ("Collective Group"), pursuant to 29 U.S.C. § 216(b).

349.    **Collective Group Definition:** Plaintiffs pursue the requested relief on behalf of the following nationwide Collective Group:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period.

350.    **Collective Subgroup A Definition:**  All Plaintiffs also pursue the requested relief on behalf of the following nationwide Subgroup ("Collective Subgroup A") of the Collective Group defined above:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that require Supervisors to work on-call shifts.

351.    **Collective Subgroup B Definition:**  Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, and Mays ("Collective Subgroup B Plaintiffs") also pursue the requested relief on behalf of the following nationwide Subgroup ("Collective Subgroup B") of the Collective Group defined above:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that utilize the flat rate method of compensation for on-call shifts.

59

352.    **Collective Subgroup C Definition:**   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, and Mays ("Collective Subgroup C Plaintiffs") also pursue the requested relief on behalf of the following nationwide Subgroup ("Collective Subgroup C")  of the Collective Group defined above:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that awarded "comp time" to Supervisors.

353.    Plaintiffs are members of the Collective Group because they were employed by Defendants in similar positions during the time period relevant to this action, and were required to falsify their timesheets pursuant to the Policy.  As such, Plaintiffs and members of the Collective Group routinely worked more than 40 hours per week, and did not receive proper overtime compensation for all of the hours that they worked over 40 hours per week.

354.    Plaintiffs are members of Collective Subgroup A because they were employed by Defendants in similar positions during the time period relevant to this action, were required to falsify their timesheets pursuant to the Policy, and worked at Branches that required them to work on-call.  As such, Plaintiffs and members of Collective Subgroup A routinely worked more than 40 hours per week, and did not receive proper overtime compensation for all of the hours that they worked over 40 hours per week, and while on-call.

355.    Collective Subgroup B Plaintiffs are also members of Collective Subgroup B because they were employed by Defendants in similar positions during the time period relevant to this action, were required to falsify their timesheets pursuant to the Policy, worked at Branches that required them to work on-call, and were compensated using the flat rate method.  As such, Collective Subgroup B Plaintiffs and members of Collective Subgroup B routinely worked more than 40 hours per week, and did not receive proper overtime compensation for all of the hours

that they worked over 40 hours per week, or while on-call, but instead received a flat rate— irrespective of the actual numbers of hours that they worked—for performing on-call duties.

356. Collective Subgroup C Plaintiffs are also members of Collective Subgroup C because they were employed by Defendants in similar positions during the time period relevant to this action, were required to falsify their timesheets pursuant to the Policy, and worked at Branches that awarded "comp time." As such, Collective Subgroup C Plaintiffs and members of Collective Subgroup C routinely worked more than 40 hours per week, and did not receive proper overtime compensation for all of the hours that they worked over 40 hours per week, but received "comp time" instead of timely, and proper, overtime premiums.

357. Plaintiffs' FLSA Collective Action consent forms are attached hereto as Exhibits A through L, respectively.

358. Although Plaintiffs and the Collective Group members may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

      a.    Plaintiffs and the Collective Group members performed substantially similar job duties as Supervisors;

      b.    Plaintiffs and the Collective Group members were paid on an hourly basis;

      c.    Plaintiffs and the Collective Group were required to falsify their timesheets pursuant to the Policy; and

      d.    As a result of the Policy, Plaintiffs and the Collective Group were not compensated for all the hours that they worked for the benefit of Defendants.

359. Although Plaintiffs and the members of Collective Subgroup A may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

a.   Plaintiffs and members of Collective Subgroup A performed substantially similar job duties as Supervisors;

b.   Plaintiffs and members of Collective Subgroup A were paid on an hourly basis;

c.   Plaintiffs and members of Collective Subgroup A were required to be on-call as a condition of their employment;

d.   Plaintiffs and members of Collective Subgroup A were required to falsify their timesheets pursuant to the Policy; and

e.   As a result of the Policy, Plaintiffs and members of Collective Subgroup A were not compensated for all the hours that they worked for the benefit of Defendants.

360.   Although Collective Subgroup B Plaintiffs and members of Collective Subgroup B may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

a.   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B performed substantially similar job duties as Supervisors;

b.   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B were paid on an hourly basis;

c.   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B were required to be on-call as a condition of their employment;

d.   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B were paid a flat rate in exchange for performing on-call duties, irrespective of the hours they actually worked;

e.   Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B were required to falsify their timesheets pursuant to the Policy; and

      f.     As a result of the Policy, Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, Mays, and members of Collective Subgroup B were not compensated for all the hours that they worked for the benefit of Defendants.

361.    Although Collective Subgroup C Plaintiffs and members of Collective Subgroup C may have had different job titles and/or worked in different locations throughout the time period relevant to this action, this action may be properly maintained as a Collective Action because:

      a.     Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, Mays, and members of Collective Subgroup C performed substantially similar job duties as Supervisors;

      b.     Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, Mays, and members of Collective Subgroup C were paid on an hourly basis;

      c.     Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, Mays, and members of Collective Subgroup C were awarded "comp time" instead of timely, and proper, overtime premiums;

      d.     Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, Mays, and members of Collective Subgroup C were required to falsify their timesheets pursuant to the Policy; and

      e.     As a result of the Policy, Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, Mays, and members of Collective Subgroup C were not compensated for all the hours that they worked for the benefit of the Defendants.

362.    Defendants encouraged, required, and permitted Plaintiffs and the Collective Group members to work without being properly compensated. In fact, Defendants implemented the Policy with the intent that Plaintiffs and the members of the Collective Group would not be properly compensated for all of the hours that they worked.

363.    Defendants knew that Plaintiffs and the Collective Group members performed work that required additional wages and overtime compensation to be paid, and that Plaintiffs and the Collective Group members could not perform all of their duties within the normal 40

hour workweek. Nevertheless, Defendants failed to take any measures that would remediate or hamper the Policy, as described above, which deprived Plaintiffs and the Collective Group members of proper wages and overtime compensation.

364.    Defendants' conduct, as alleged herein, was willful and has caused significant damage to Plaintiffs and the Collective Group members. Indeed, a goal of Defendants' Policy was to falsify and destroy records that could be used to challenge the Policy and remediate Defendants' violations of the FLSA.

365.    Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and the Collective Group members. Plaintiffs request that the Court authorize notice to the members of the Collective Group, and the Collective Subgroups, to inform them of the pendency of this action and their right to opt-in to this lawsuit pursuant to 29 U.S.C. § 216(b), for the purpose of seeking unpaid wages, unpaid overtime compensation, liquidated damages under the FLSA, and the other relief requested herein.

366.    Plaintiffs estimate that the Collective Group, including both current and former employees over the time period relevant to this action, will include at least one hundred (100) members. The precise number of Collective Group members is readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c). Given the composition and size of the Collective Group, its members may be informed of the pendency of this action directly via U.S. mail, e-mail, and by posting notice in Defendants' offices.

## CLASS ALLEGATIONS

367.    All Plaintiffs, individually, and on behalf of and a nationwide Class of all other individuals similarly situated (the "Declaratory Judgment Class"), seek declaratory judgment, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 23.

368.    **Declaratory Judgment Class Definition**: Plaintiffs pursue the requested relief on behalf of the following nationwide Declaratory Judgment Class of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period.

> Excluded from the Declaratory Judgment Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

369.    As a Subclass of the Declaratory Judgment Class, all Plaintiffs also pursue declaratory judgment on behalf of the following nationwide Subclass ("Declaratory Judgment Subclass A") of similarly situated individuals, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 23.

370.    **Declaratory Judgment Subclass A Definition**: Plaintiffs pursue the requested relief on behalf of the following nationwide Declaratory Judgment Subclass of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that require Supervisors to work on-call shifts.

> Excluded from Declaratory Judgment Subclass A are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers

and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

371. As a Subclass of the Declaratory Judgment Class, Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, and Mays also pursue declaratory judgment on behalf of the following nationwide Subclass ("Declaratory Judgment Subclass B") of similarly situated individuals, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 23.

372. **Declaratory Judgment Subclass B Definition**: Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Ward, Cheatham, Woodland, and Mays ("Declaratory Judgment Subclass B Plaintiffs") pursue the requested relief on behalf of the following nationwide Declaratory Judgment Subclass of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that utilize the flat rate method of compensation for on-call shifts.

> Excluded from Declaratory Judgment Subclass B are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

373. As a Subclass of the Declaratory Judgment Class, Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, and Mays also pursue declaratory judgment on behalf of the following nationwide Subclass ("Declaratory Judgment Subclass C") of similarly situated individuals, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 23.

374.     **Declaratory Judgment Subclass C Definition**: Plaintiffs Owens, Collinge, Niles, Felgar, Haverkamp, Woodland, and Mays ("Declaratory Judgment Subclass C Plaintiffs") pursue the requested relief on behalf of the following nationwide Declaratory Judgment Subclass of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches that awarded "comp time" to Supervisors.

> Excluded from Declaratory Judgment Subclass C are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

375.     In addition to the Declaratory Judgment Class, all Plaintiffs bring their conversion claims as a Class Action on behalf of themselves and a nationwide Class of all other individuals similarly situated (the "Conversion Class"), pursuant to Fed. R. Civ. P. 23.

376.     **Conversion Class Definition**: Plaintiffs pursue the requested relief on behalf of the following nationwide Conversion Class of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period.

> Excluded from the Conversion Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

377.    In addition to the Declaratory Judgment Class and the Conversion Class, Plaintiffs Phillips, Bush, Niles, Felgar, Haverkamp, Ward, Cheatham, and Judson bring their IMWL and IWPCA claims as a Class Action on behalf of themselves and a Class of all other individuals similarly situated in Illinois (the "Illinois Class"), pursuant to Fed. R. Civ. P. 23.

378.    **Illinois Class Definition**: Plaintiffs Phillips, Bush, Niles, Felgar, Haverkamp, Ward, Cheatham, and Judson ("Illinois Class Plaintiffs") pursue the requested relief on behalf of the following Illinois Class of similarly situated individuals:

> All individuals who currently work, or have worked, for Defendants as Supervisors, or any other similarly titled position during the applicable statute of limitations period, at Branches located in Illinois.

> Excluded from the Illinois Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' officers and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

379.    **Numerosity**: Upon information and belief, Plaintiffs estimate that the Declaratory Judgment Class, the Conversion Class, and the Illinois Class, including both current and former employees over the time period relevant to this action, will include at least one hundred (100) members each.  Defendants have a total of 146 Branches in 8 states, with 44 branch offices in Illinois.  The majority of those Branches, if not all of them, have employed Supervisors during the time period relevant to this action, and have required Supervisors to work on-call.  It is believed that each of these locations employs several Supervisors.  The precise number of Class members is readily available from Defendants' personnel, scheduling, time, and payroll records maintained in accordance with 29 U.S.C. § 211(c).

380. **Commonality and Predominance**: There are several questions of law and fact common to the claims of the Plaintiffs, and members of the various Classes which predominate over any individual issues.

381. With respect to Plaintiffs and members of the Declaratory Judgment Class, those issues include, but are not limited to:

      a.    Whether Help at Home, Davis, Cantrell, and/or Newbern are Plaintiffs' and Declaratory Judgment Class members' joint employers for purposes of the FLSA;

      b.    Whether Plaintiffs and Declaratory Judgment Class members were paid on an hourly basis;

      c.    Whether Plaintiffs and Declaratory Judgment Class members were, and should have been, classified as "exempt" pursuant to the FLSA;

      d.    Whether Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

      e.    Whether the Policy caused Plaintiffs and Declaratory Judgment Class members to falsify their timesheets;

      f.    Whether the Policy violates the FLSA's recordkeeping requirements;

      g.    Whether Plaintiffs and Declaratory Judgment Class members are entitled to assert the "just and reasonable inference" standard;

      h.    Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Plaintiffs' and Declaratory Judgment Class members' FLSA claims;

      i.    The precise and proper method that should be used to calculate Plaintiffs' and Declaratory Judgment Class members' "regular rate," as defined by the FLSA; and

      j.    Whether Plaintiffs and Declaratory Judgment Class members are entitled to liquidated damages under the FLSA.

382.     With respect to Plaintiffs and members of Declaratory Judgment Subclass A, those issues include, but are not limited to:

a.      Whether Help at Home, Davis, Cantrell, and/or Newbern are Plaintiffs' and Declaratory Judgment Subclass A members' joint employers for purposes of the FLSA;

b.      Whether Plaintiffs and Declaratory Judgment Subclass A members were paid on an hourly basis;

c.      Whether Plaintiffs and Declaratory Judgment Subclass A members were, and should have been, classified as "exempt" pursuant to the FLSA;

d.      Whether Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

e.      Whether the Policy caused Plaintiffs and Declaratory Judgment Subclass A members to falsify their timesheets;

f.      Whether the entire duration of Plaintiffs' and Declaratory Judgment Subclass A members' on-call shifts were time spent working for the benefit of Help at Home, Davis, Cantrell, and/or Newbern;

g.      Whether Plaintiffs and Declaratory Judgment Subclass A members should have been compensated for the entirety of their on-call shifts;

h.      Whether notes pertaining to the duties that Plaintiffs and members of Declaratory Judgment Subclass A performed while working on-call were records that were required to be preserved pursuant to the FLSA's recordkeeping requirements;

i.      Whether the Policy violates the FLSA's recordkeeping requirements;

j.      Whether Plaintiffs and Declaratory Judgment Subclass A members are entitled to assert the "just and reasonable inference" standard;

k.      Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Plaintiffs' and Declaratory Judgment Subclass A members' FLSA claims;

l.      The precise and proper method that should be used to calculate Plaintiffs' and Declaratory Judgment Subclass A members' "regular rate," as defined by the FLSA; and

   m. Whether Plaintiffs and Declaratory Judgment Subclass A members are entitled to liquidated damages under the FLSA.

383. With respect to Declaratory Judgment Subclass B Plaintiffs and members of Declaratory Judgment Subclass B, those issues include, but are not limited to:

   a. Whether Help at Home, Davis, Cantrell, and/or Newbern are Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' joint employers for purposes of the FLSA;

   b. Whether Declaratory Judgment Subclass B Plaintiffs and members of Declaratory Judgment Subclass B were paid on an hourly basis;

   c. Whether Declaratory Judgment Subclass B Plaintiffs and members of Declaratory Judgment Subclass B were, and should have been, classified as "exempt" pursuant to the FLSA;

   d. Whether Help at Home, Davis, Cantrell, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

   e. Whether the Policy caused Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members to falsify their timesheets;

   f. Whether the entire duration of Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' on-call shifts were time spent working for the benefit of Help at Home, Davis, Cantrell, and/or Newbern;

   g. Whether Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members should have been compensated for the entirety of their on-call shifts;

   h. Whether the flat rate method used to compensate Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members for their on-call shifts was proper overtime premiums as provided for the by FLSA;

   i. Whether notes pertaining to the duties that Declaratory Judgment Subclass B Plaintiffs and the members Declaratory Judgment Subclass B performed while working on-call were records that were required to be preserved pursuant to the FLSA's recordkeeping requirements;

   j. Whether the Policy violates the FLSA's recordkeeping requirements;

k.      Whether Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members are entitled to assert the "just and reasonable inference" standard;

l.      Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' FLSA claims;

m.      Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in establishing the flat rate method of compensation for on-call shifts such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' FLSA claims;

n.      Whether the flat rate method used to compensate Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members for their on-call shifts is to be excluded from the "regular rate," as defined by the FLSA;

o.      The precise and proper method that should be used to calculate Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' "regular rate," as defined by the FLSA; and

p.      Whether Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members are entitled to liquidated damages under the FLSA.

384.    With respect to Plaintiffs Declaratory Judgment Subclass C Plaintiffs and members of Declaratory Judgment Subclass C, those issues include, but are not limited to:

a.      Whether Help at Home, Davis, Cantrell, and/or Newbern are Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' joint employers for purposes of the FLSA;

b.      Whether Declaratory Judgment Subclass C Plaintiffs and members of Declaratory Judgment Subclass C were paid on an hourly basis;

c.      Whether Declaratory Judgment Subclass C Plaintiffs and members of Declaratory Judgment Subclass C were, and should have been, classified as "exempt" pursuant to the FLSA;

d.    Whether Help at Home, Davis, Cantrell, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

e.    Whether the Policy caused Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members to falsify their timesheets;

f.    Whether, pursuant to the FLSA, the "comp time" awarded to Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members should have been paid during the week in which Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C performed the work that caused "comp time" to be awarded;

g.    Whether the "comp time" method denied Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members their right to proper overtime premiums as provided for the by FLSA;

h.    Whether Help at Home, Davis, Cantrell, and/or Newbern's requirement that Declaratory Judgment Subclass C Plaintiffs and the members of Declaratory Judgment Subclass C not record "comp time" on their timesheets violated the FLSA's recordkeeping requirements;

i.    Whether the Policy violates the FLSA's recordkeeping requirements;

j.    Whether Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to assert the "just and reasonable inference" standard;

k.    Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' FLSA claims;

l.    Whether Help at Home, Davis, Cantrell, and/or Newbern acted willfully in establishing the "comp time" method of compensation such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' FLSA claims;

m.    The precise and proper method that should be used to calculate Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' "regular rate," as defined by the FLSA; and

n.    Whether Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to liquidated damages under the FLSA.

385.    With respect to Plaintiffs and members of the Conversion Class, those issues include, but are not limited to:

      a.      Whether Plaintiffs and Conversion Class members were entitled to wages that they did not receive;

      b.      Whether Help at Home retained possession of Plaintiffs' and Conversion Class members' wages;

      c.      The precise and proper method that should be used to calculate the amount of wages that Plaintiffs and Conversion Class members did not receive;

      d.      Whether Illinois law applies to all of the conversion claims brought by Plaintiffs and members of the Conversion Class; and

      e.      Whether Help at Home converted monies belonging to Plaintiffs and members of the Conversion Class.

386.    With respect to Illinois Class Plaintiffs and members of the Illinois Class, those issues include, but are not limited to:

      a.      Whether Help at Home, Davis, Cantrell, and/or Newbern are Illinois Class Plaintiffs' and Illinois Class members' joint employers;

      b.      Whether Illinois Class Plaintiffs and Illinois Class members were paid on an hourly basis;

      c.      Whether Defendants' acts and omissions described herein lead to the creation and continued existence of the Policy;

      d.      Whether the Policy caused Illinois Class Plaintiffs and Illinois Class members to falsify their timesheets;

      e.      Whether Illinois Class Plaintiffs and the Illinois Class members worked in excess of 40 hours per week at Defendants' Branches in Illinois;

      f.      Whether the entire duration of Illinois Class Plaintiffs' and Illinois Class members' on-call shifts were time spent working for the benefit of Defendants;

      g.      Whether Illinois Class Plaintiffs and the Illinois Class members should have been compensated for the entirety of their on-call shifts;

h.  Whether Illinois Class Plaintiffs and the Illinois Class members were appropriately compensated for any additional hours worked over 40 hours per week;

i.  Whether Illinois Class Plaintiffs and the Illinois Class members were damaged by Defendants' actions;

j.  The precise and proper method that should be used to calculate the amount of wages that Illinois Class Plaintiffs and the Illinois Class members did not receive;

k.  Whether Defendants violated the IMWL; and

l.  Whether Defendants violated the IWPCA.

387.  **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Classes and Subclasses. All claims of Plaintiffs and the members of the Classes are based on the same legal and factual issues, as those claims all arise out of Defendants' common Policy. Indeed, Plaintiffs, like all Supervisors, performed the same job duties, were paid on an hourly basis, and were required to falsify their timesheets pursuant to the Policy.

388.  **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes and Subclasses. Plaintiffs do not have any interests antagonistic to those of the proposed Classes and Subclasses. Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation. The questions of law and fact common to the proposed members of the Classes and Subclasses predominate over any questions affecting only individual members of the Classes and Subclasses.

389.  **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for members of the proposed Classes and Subclasses to prosecute their claims individually. The trial and the litigation of Plaintiffs' claims are manageable.

**COUNT I**
**Violation of the Fair Labor Standards Act**
**(29 U.S.C. §§ 201, *et seq.*)**
**(On Behalf of Plaintiffs, the Collective Group, and All Related Subgroups)**
**(Against All Defendants)**

390.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1-389 with same force and effect as though fully set forth herein.

391.    Plaintiffs' and Collective Group members' work activities—both in the office and while on-call—engaged and engage them individually in commerce, as defined by 29 U.S.C. § 203(b).

392.    Plaintiffs and Collective Group members were and are entitled to compensation for all hours they worked for Defendants.

393.    In relevant part, 29 U.S.C. § 206(a)(1)(C) requires that employers compensate employees at a rate not less than $7.25 per hour

394.    In relevant part, 29 U.S.C. § 207(a) requires that employers compensate employees at a rate not less than one and one-half times their regular hourly rate for all hours worked in excess of 40 hours per week.

395.    Pursuant to Defendants' uniform Policy, Plaintiffs and Collective Group members were forced to falsify their timesheets to reflect that they only worked 40 hours per week.

396.    As a result of the Policy, Plaintiffs and Collective Group members were not, and are not, compensated at all for additional hours worked while in Defendants' offices in excess of 40 hours per week.

397.    In addition, Plaintiffs and members of Collective Subgroup A were not properly compensated for the time they spent working on-call, as a result of the Policy, as set forth above.

398.     Similarly, Collective Subgroup B Plaintiffs and members of Collective Subgroup B were not compensated on an hourly basis for the time they spent working on-call, and the flat rate they were paid was improperly excluded from their "regular rate."  As such, Collective Subgroup B Plaintiffs and members of Collective Subgroup B were not compensated, at all, for the time they spent working while on-call.

399.     Moreover, Collective Subgroup B Plaintiffs and members of Collective Subgroup B were also undercompensated for all hours that they worked, regardless of whether those hours occurred while on-call, as Defendants failed to include that flat rate in calculating their "regular rate" for all hour worked.

400.     Finally, Collective Subgroup C Plaintiffs and members of Collective Subgroup C were also denied their right to payment of timely, and appropriate, wages for all hours of "comp time" they received, as set forth above.

401.     Defendants violated 29 U.S.C. § 206(a)(1)(C) and 29 U.S.C. § 207(a) when they failed to compensate Plaintiffs and Collective Group members for any hours worked in excess of 40 hours per week.

402.     Defendants knew of the FLSA requirements described herein.

403.     Defendants' violations of the FLSA requirements described herein were willful.

404.     Plaintiffs and the Collective Group members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of wages and overtime compensation owed for time worked in excess of 40 hours per week from which Defendants derived a direct and substantial benefit.

405.     Plaintiffs and Collective Group members are entitled to the amount of their unpaid wages and overtime compensation, pursuant to 29 U.S.C. § 216(b).

77

406. Plaintiffs and Collective Group members are also entitled to liquidated damages in an amount equal to the amount of their unpaid wages and overtime compensation, pursuant to 29 U.S.C. § 216(b).

407. Plaintiffs and Collective Group members are also entitled to reasonable attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Plaintiffs, individually, and on behalf of the Collective Group, and all related Subgroups, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a Collective Action, as set forth by 29 U.S.C. § 216(b), and certifying the Collective Group, and all related Subgroups, defined herein;

B. Designating Plaintiffs as representatives of the Collective Group, and all related Subgroups, and their undersigned counsel as Collective Group Counsel;

C. Entering judgment in favor of Plaintiffs, the Collective Group, and all related Subgroups, and against Defendants, jointly and severally;

D. Awarding Plaintiffs, the Collective Group, and all related Subgroups, all unpaid wages and overtime compensation to which they are entitled;

E. Awarding Plaintiffs, the Collective Group, and all related Subgroups, liquidated damages in an amount equal to the amount of their unpaid wages and overtime compensation to which they are entitled;

F. Awarding Plaintiffs, the Collective Group, and all related Subgroups reasonable attorneys' fees and costs; and

G. Granting all such further and other relief as the Court deems just and appropriate.

## COUNT II
### Declaratory Judgment
### (28 U.S.C. §§ 2201, *et seq.*)
### (On Behalf of Plaintiffs, the Declaratory Judgment Class, and All Related Subclasses)
### (Against All Defendants)

408. Plaintiffs repeat and re-allege the allegations in Paragraphs 1-389 with same force and effect as though fully set forth herein.

409. At all relevant times, there was in effect the Declaratory Judgment Act ("DJA"), 28 U.S.C. §2201(a), which states, in relevant part:

> In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

410. Plaintiffs, individually, and on behalf of the Declaratory Judgment Class members, seek an order declaring that:

    a.      Help at Home, Davis, Cantrell, and/or Newbern are Plaintiffs' and Declaratory Judgment Class members' joint employers for purposes of the FLSA;

    b.      Plaintiffs and Declaratory Judgment Class members were paid on an hourly basis;

    c.      Plaintiffs and Declaratory Judgment Class members were not, and should not have been, classified as "exempt" pursuant to the FLSA;

    d.      Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

    e.      The Policy caused Plaintiffs and Declaratory Judgment Class members to falsify their timesheets;

    f.      The Policy violated the FLSA's recordkeeping requirements;

    g.      Plaintiffs and Declaratory Judgment Class members are entitled to assert the "just and reasonable inference" standard with respect to their FLSA claims;

h.      Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Plaintiffs' and Declaratory Judgment Class members' FLSA claims;

i.      Plaintiffs' and Declaratory Judgment Class members' "regular rate" is to be calculated by adding Plaintiffs' and Declaratory Judgment Class members' hourly rate of pay to any payments that do not qualify as overtime premiums, in accordance with the FLSA; and

j.      Plaintiffs and Declaratory Judgment Class members are entitled to liquidated damages under the FLSA.

411.    Plaintiffs, individually, and on behalf of the Declaratory Judgment Subclass A members, seek an order declaring that:

a.      Help at Home, Davis, Cantrell, and/or Newbern are Plaintiffs' and Declaratory Judgment Subclass A members' joint employers for purposes of the FLSA;

b.      Plaintiffs and Declaratory Judgment Subclass A members were paid on an hourly basis;

c.      Plaintiffs and Declaratory Judgment Subclass A members were not, and should not have been, classified as "exempt" pursuant to the FLSA;

d.      Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

e.      The Policy caused Plaintiffs and Declaratory Judgment Subclass A members to falsify their timesheets;

f.      The entire duration of Plaintiffs' and Declaratory Judgment Subclass A members' on-call shifts were time spent working for the benefit of Help at Home, Davis, Cantrell, and/or Newbern;

g.      Plaintiffs and Declaratory Judgment Subclass A members should have been compensated for the entirety of their on-call shifts;

h.      Notes pertaining to the duties that Plaintiffs and members of Declaratory Judgment Subclass A performed while working on-call were records that were required to be preserved pursuant to the FLSA's recordkeeping requirements;

      i.      The Policy, including the destruction of the notes made by Plaintiffs and Declaratory Judgment Subclass A members, violated the FLSA's recordkeeping requirements;

      j.      Plaintiffs and Declaratory Judgment Subclass A members are entitled to assert the "just and reasonable inference" standard with respect to their FLSA claims;

      k.      Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Plaintiffs' and Declaratory Judgment Subclass A members' FLSA claims;

      l.      Plaintiffs' and Declaratory Judgment Subclass A members' "regular rate" is to be calculated by adding Plaintiffs' and Declaratory Judgment Subclass A members' hourly rate of pay to any payments that do not qualify as overtime premiums, in accordance with the FLSA; and

      m.      Plaintiffs and Declaratory Judgment Subclass A members are entitled to liquidated damages under the FLSA.

412.    Declaratory Judgment Subclass B Plaintiffs, individually, and on behalf of the Declaratory Judgment Subclass B members, seek an order declaring that:

      a.      Help at Home, Davis, Cantrell, and/or Newbern are Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' joint employers for purposes of the FLSA;

      b.      Declaratory Judgment Subclass B Plaintiffs and members of Declaratory Judgment Subclass B were paid on an hourly basis;

      c.      Declaratory Judgment Subclass B Plaintiffs and members of Declaratory Judgment Subclass B were not, and should not have been, classified as "exempt" pursuant to the FLSA;

      d.      Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

      e.      The Policy caused Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members to falsify their timesheets;

      f.      The entire duration of Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members' on-call shifts were time spent working for the benefit of Help at Home, Davis, Cantrell, and/or Newbern;

g.   Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members should have been compensated for the entirety of their on-call shifts;

h.   The flat rate method used to compensate Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members for their on-call shifts denied them proper overtime premiums as provided for the by FLSA;

i.   Notes pertaining to the duties that Declaratory Judgment Subclass B Plaintiffs and the members Declaratory Judgment Subclass B performed while working on-call were records that were required to be preserved pursuant to the FLSA's recordkeeping requirements;

j.   The Policy, including the destruction of the notes made by Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members, violated the FLSA's recordkeeping requirements;

k.   Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members are entitled to assert the "just and reasonable inference" standard with respect to their FLSA claims;

l.   Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' FLSA claims;

m.   Help at Home, Davis, Cantrell, and/or Newbern acted willfully in establishing the flat rate method of compensation for on-call shifts such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' FLSA claims pertaining to compensation for on-call time;

n.   The flat fee paid to Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members for their on-call shifts should be included in the calculation of Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' "regular rate," and not credited towards any overtime premiums due;

o.   Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' "regular rate" is to be calculated by adding Declaratory Judgment Subclass B Plaintiffs' and Declaratory Judgment Subclass B members' hourly rate of pay to any payments that do not qualify as overtime premiums, in accordance with the FLSA; and

        p.       Declaratory Judgment Subclass B Plaintiffs and Declaratory Judgment Subclass B members are entitled to liquidated damages under the FLSA.

413.    Declaratory Judgment Subclass C Plaintiffs, individually, and on behalf of the Declaratory Judgment Subclass C members, seek an order declaring that:

    a.       Help at Home, Davis, Cantrell, and/or Newbern are Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' joint employers for purposes of the FLSA;

    b.       Declaratory Judgment Subclass C Plaintiffs and members of Declaratory Judgment Subclass C were paid on an hourly basis;

    c.       Declaratory Judgment Subclass C Plaintiffs and members of Declaratory Judgment Subclass C were not, and should not have been, classified as "exempt" pursuant to the FLSA;

    d.       Help at Home's, Davis's, Cantrell's, and/or Newbern's acts and omissions described herein lead to the creation and continued existence of the Policy;

    e.       The Policy caused Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members to falsify their timesheets;

    f.       Pursuant to the FLSA, the "comp time" awarded to Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members should have been paid during the week in which Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C performed the work that caused "comp time" to be awarded;

    g.       The "comp time" method used to compensate Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members denied them their right to proper overtime premiums as provided for the by FLSA;

    h.       Help at Home's, Davis's, Cantrell's, and/or Newbern's requirement that Declaratory Judgment Subclass C Plaintiffs and the members of Declaratory Judgment Subclass C not record "comp time" on their timesheets violated the FLSA's recordkeeping requirements;

    i.       The Policy violated the FLSA's recordkeeping requirements;

    j.       Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to assert the "just and reasonable inference" standard with respect to their FLSA claims;

k.  Help at Home, Davis, Cantrell, and/or Newbern acted willfully in enacting the Policy such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' FLSA claims;

l.  Help at Home, Davis, Cantrell, and/or Newbern acted willfully in establishing the "comp time" method of compensation such that the FLSA's three year statute of limitations applies to Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' FLSA claims;

m.  Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' "regular rate" is to be calculated by adding Declaratory Judgment Subclass C Plaintiffs' and Declaratory Judgment Subclass C members' hourly rate of pay to any payments that do not qualify as overtime premiums, in accordance with the FLSA;

n.  In weeks where Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members were not paid for hours worked, but were rather awarded "comp time," and where that "comp time" was used in later weeks by Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members, Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to overtime premiums at a rate one and one-half times their "regular rate" established in the week that work was performed;

o.  In weeks where Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members were not paid for hours worked, but were rather awarded "comp time," and where that "comp time" was not used in later weeks by Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members, Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to one-half times their "regular rate" established in the week that work was performed; and

p.  Declaratory Judgment Subclass C Plaintiffs and Declaratory Judgment Subclass C members are entitled to liquidated damages under the FLSA.

414.  The controversies presented in this case are definite and concrete, and affect the adverse legal interests of the parties. Plaintiffs and Declaratory Judgment Class members have a legal right to proper compensation under the FLSA, and Help at Home, Davis, Cantrell, and/or Newbern have an opposing tangible legal interest in the claims set forth herein. This case will

determine the legal scope of Help at Home's, Davis's, Cantrell's, and/or Newbern's obligations to Plaintiffs and Declaratory Judgment Class members relative to the amount of compensation and damages that Plaintiffs and Declaratory Judgment Class members are entitled to recover, among other things.

415.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment because Help at Home, Davis, Cantrell, and/or Newbern deprived, and continue to deprive, Plaintiffs and members of the Declaratory Judgment Class of their legal right to appropriate compensation under the FLSA. Plaintiffs and Declaratory Judgment Class members have suffered an "injury in fact" as a result of Help at Home's, Davis's, Cantrell's, and/or Newbern's wrongful failure to compensate them properly for all of the hours that Plaintiffs and the Declaratory Judgment Class members worked for Help at Home's, Davis's, Cantrell's, and/or Newbern's benefit.

416.    Consequently, Plaintiffs and Declaratory Judgment Class members have been, and will continue to be, caused significant harm in that they have been unlawfully deprived of proper compensation as required by the FLSA. Plaintiffs and Declaratory Judgment Class members will continue to suffer financial harm, if the Court were to deny their request for declaratory relief.

417.    If the Court were to deny Plaintiffs' and Declaratory Judgment Class members' request for declaratory relief, this controversy will continue to exist, as Plaintiffs' and Declaratory Judgment Class members' ability to pursue their legal remedies under the FLSA and other similar laws is contingent upon the declaration requested herein, and because Help at Home, Davis, Cantrell, and/or Newbern refuse to fulfill their legal obligations to Plaintiffs and the Declaratory Judgment Class.

418.    Based on the foregoing facts, the Court should declare the rights and other legal remedies relative to Plaintiffs' and Declaratory Judgment Class members' claims under the FLSA and other similar laws relative to employee compensation.

WHEREFORE, Plaintiffs, individually, and on behalf of the Declaratory Judgment Class, and all related Subclasses, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Declaratory Judgment Class, and all related Subclasses, defined herein;

B.    Designating Plaintiffs as representatives of the Declaratory Judgment Class, and all related Subclasses, and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs, the Declaratory Judgment Class, and all related Subclasses, and against Help at Home, Davis, Cantrell, and/or Newbern, jointly and severally;

D.    Issuing an order declaring the legal rights of Plaintiffs, Declaratory Judgment Class members, and all related Subclass members, with respect to the claims under the FLSA and other similar laws regarding employee compensation;

E.    Awarding Plaintiffs, the Declaratory Judgment Class, and all related Subclasses reasonable attorneys' fees and costs; and

F.    Granting all such further and other relief as the Court deems just and appropriate.

## COUNT III
### Violation of the Illinois Minimum Wage Law
### (820 ILCS 105/1, *et seq.*)
### (On Behalf of Illinois Class Plaintiffs and the Illinois Class)
### (Against All Defendants)

419.    Illinois Class Plaintiffs repeat and re-allege the allegations in Paragraphs 1-389 with same force and effect as though fully set forth herein.

420.    Illinois Class Plaintiffs' and Illinois Class members' work activities—both in the office and while on-call—entitled and entitle them to wages, as defined by 820 ILCS 105/3(b).

421. Illinois Class Plaintiffs and Illinois Class members were and are entitled to compensation for all hours they worked for Defendants.

422. In relevant part, 820 ILCS 105/4(a)(1) requires that employers compensate employees at a rate not less than $8.25 per hour.

423. In relevant part, 820 ILCS 105/4a(1) requires that employers compensate employees at a rate not less than one and one-half times their regular hourly rate for all hours worked in excess of 40 hours per week.

424. Pursuant to Defendants' uniform Policy, Illinois Class Plaintiffs and Illinois Class members were forced to falsify their timesheets to reflect that they only worked 40 hours per week.

425. As a result of the Policy, Illinois Class Plaintiffs and Illinois Class members were not, and are not, compensated at all for additional hours they worked for Defendants in excess of 40 hours per week.

426. Defendants violated 820 ILCS 105/4(a)(1) and 820 ILCS 105/4a(1) when they failed to compensate Illinois Class Plaintiffs and Illinois Class members for any hours worked in excess of 40 hours per week.

427. Defendants knew of the IMWL requirements described herein.

428. Defendants' violations of the IMWL requirements described herein were willful.

429. Illinois Class Plaintiffs and Illinois Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of wages and overtime compensation owed for time they worked in excess of 40 hours per week from which Defendants derived a direct and substantial benefit.

430.     Illinois Class Plaintiffs and Illinois Class members are entitled to the amount of their unpaid wages and overtime compensation, pursuant to 820 ILCS 105/12(a).

431.     Illinois Class Plaintiffs and Illinois Class members are also entitled to damages in an amount equal to 2% of the amount of all unpaid wages and overtime compensation for each month following the date of payment during which such underpayments remain unpaid, pursuant to 820 ILCS 105/12(a).

432.     Illinois Class Plaintiffs and Illinois Class members are also entitled to reasonable attorneys' fees and costs, pursuant to 820 ILCS 105/12(a).

WHEREFORE, Illinois Class Plaintiffs, individually, and on behalf of the Illinois Class, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Illinois Class defined herein;

B.     Designating Illinois Class Plaintiffs as representatives of the Illinois Class and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Illinois Class Plaintiffs and the Illinois Class, and against Defendants, jointly and severally;

D.     Awarding Illinois Class Plaintiffs and the Illinois Class all unpaid wages and overtime compensation to which they are entitled;

E.     Awarding Illinois Class Plaintiffs and the Illinois Class damages in an amount equal to 2% of the amount of all unpaid wages and overtime compensation for each month following the date of payment during which such underpayments remain unpaid;

F.     Awarding Illinois Class Plaintiffs and the Illinois Class reasonable attorneys' fees and costs; and

G.     Granting all such further and other relief as the Court deems just and appropriate.

## COUNT IV
### Violation of the Illinois Wage Payment and Collection Act
### (820 ILCS 115/1, *et seq*.)
### (On Behalf of Illinois Class Plaintiffs and the Illinois Class)
### (Against All Defendants)

433.     Illinois Class Plaintiffs repeat and re-allege the allegations in Paragraphs 1-389 with same force and effect as though fully set forth herein.

434.     Illinois Class Plaintiffs' and Illinois Class members' work activities—both in the office and while on-call—entitled and entitle them to wages, as defined by 820 ILCS 115/2.

435.     Illinois Class Plaintiffs and Illinois Class members were and are entitled to compensation for all hours they worked for Defendants.

436.     Pursuant to Defendants' uniform Policy, Illinois Class Plaintiffs and Illinois Class members were and are to be paid their earned wages based upon a bi-weekly pay period.

437.     In relevant part, 820 ILCS 115/4 requires that employers compensate employees for their earned wages not later than 13 days after then end of any bi-weekly pay period.

438.     Pursuant to Defendants' uniform Policy, Illinois Class Plaintiffs and Illinois Class members were forced to falsify their timesheets to reflect that they only worked 40 hours per week.

439.     As a result of the Policy, Illinois Class Plaintiffs and Illinois Class members were not, and are not, compensated at all for additional hours they worked for Defendants in excess of 40 hours per week.

440.     Defendants violated 820 ILCS 115/4 when they failed to compensate Illinois Class Plaintiffs and Illinois Class members for any hours they worked in excess of 40 hours per week within 13 days after the bi-weekly pay period in which the work was performed.

441.     Defendants knew of the IWPCA requirements described herein.

442. Defendants' violations of the IWPCA requirements described herein were willful.

443. Illinois Class Plaintiffs and Illinois Class members have been harmed as a direct and proximate result of Defendants' unlawful conduct because they have been deprived of wages and overtime compensation owed for time they worked in excess of 40 hours per week from which Defendants derived a direct and substantial benefit.

444. Illinois Class Plaintiffs and Illinois Class members are entitled to the amount of all unpaid wages and overtime compensation not paid within 13 days after the bi-weekly pay period in which they were earned, pursuant to 820 ILCS 115/14(a).

445. Illinois Class Plaintiffs and Illinois Class members are also entitled to damages in an amount equal to 2% of the amount of all unpaid wages and overtime compensation not paid within 13 days after the bi-weekly pay period in which they were earned for each month following the date of payment during which such underpayments remain unpaid, pursuant to 820 ILCS 115/14(a).

446. Illinois Class Plaintiffs and Illinois Class members are also entitled to reasonable attorneys' fees and costs, pursuant to 820 ILCS 115/14(a).

WHEREFORE, Illinois Class Plaintiffs, individually, and on behalf of the Illinois Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Illinois Class defined herein;

B. Designating Illinois Class Plaintiffs as representatives of the Illinois Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Illinois Class Plaintiffs and the Illinois Class, and against Defendants, jointly and severally;

D. Awarding Illinois Class Plaintiffs and the Illinois Class all unpaid wages and overtime compensation to which they are entitled;

E.      Awarding Illinois Class Plaintiffs and the Illinois Class damages in an amount equal to 2% of the amount of all unpaid wages and overtime compensation for each month following the date of payment during which such underpayments remain unpaid;

F.      Awarding Illinois Class Plaintiffs and the Illinois Class reasonable attorneys' fees and costs; and

G.      Granting all such further and other relief as the Court deems just and appropriate.

**COUNT V**
**Conversion**
**(On Behalf of Plaintiffs and the Conversion Class)**
**(Against Defendant Help at Home)**

447.    Plaintiffs repeat and re-allege the allegations in Paragraphs 1-389 with same force and effect as though fully set forth herein.

448.    Plaintiffs and Conversion Class members were and are entitled to compensation for all hours they worked for Help at Home.

449.    Plaintiffs and Conversion Class members acquired full and exclusive property rights (*i.e.*, ownership) in the compensation to which they are entitled.

450.    Plaintiffs and Conversion Class members had, and continue to have, immediate rights to possession of the compensation to which they are entitled.

451.    Pursuant to Help at Home's uniform Policy, Plaintiffs and Conversion Class members were forced to falsify their timesheets to reflect that they only worked 40 hours per week.

452.    As a result of the Policy, Plaintiffs and Conversion Class members were not compensated at all for additional hours they worked for Defendants in excess of 40 hours per week.

91

453.    Plaintiffs and Conversion Class members demanded and continue to demand that Help at Home return Plaintiffs' and Conversion Class members' property (*i.e.*, the unpaid wages), but Help at Home has refused and failed to do so.

454.    Help at Home has unlawfully converted Plaintiffs' and Conversion Class members' property (*i.e.*, the unpaid wages) by failing to pay Plaintiffs and Conversion Class members the compensation to which they are entitled.

455.    Help at Home's conduct constituting conversion took place at Help at Home's headquarters located in Illinois.  Indeed, the Policy was devised, instituted, and enforced by Help at Home's upper-level corporate managers, such as Davis and the RVPs.

456.    As such, the injury to Plaintiffs' and Conversion Class members' property (*i.e.*, the unpaid wages) occurred in Illinois, as Help at Home has retained possession of Plaintiffs' and Conversion Class members' property in accounts controlled by Help at Home at Help at Home's headquarters located in Illinois.

457.    Plaintiffs and Conversion Class members have been harmed as a direct and proximate result of Help at Home's unlawful conduct because they have been deprived of compensation to which they are entitled.

458.    Plaintiffs and Conversion Class members are entitled to the return of their property.

WHEREFORE, Plaintiffs, individually, and on behalf of the Conversion Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a Class Action, as set forth by Fed. R. Civ. P. 23, and certifying the Conversion Class defined herein;

B.    Designating Plaintiffs as representatives of the Conversion Class and their undersigned counsel as Class Counsel;

C.      Entering judgment in favor of Plaintiffs and the Conversion Class and against Help at Home;

D.      Commanding Help at Home to return Plaintiffs' and Conversion Class members' property (*i.e.*, the unpaid wages); and

E.      Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

> Plaintiffs JENNIFER PHILLIPS, TONYA BUSH, SABRINA OWENS, KATRINA COLLINGE KIMBERLY NILES, AMANDA FELGAR, DEBORAH HAVERKAMP, KIM WARD, TAMATHA CHEATHAM, HELIMA WOODLAND, WHITNEY JUDSON, and KIM MAYS, individually, and on behalf of all others similarly situated,
>
> By:   s/Thomas A.  Zimmerman, Jr.
>       Thomas A.  Zimmerman, Jr. (IL #6231944)
>       *tom@attorneyzim.com*
>       Matthew C. De Re (IL #6317913)
>       *matt@attorneyzim.com*
>       Nickolas J. Hagman (IL #6317689)
>       *nick@attorneyzim.com*
>       ZIMMERMAN LAW OFFICES, P.C.
>       77 West Washington Street, Suite 1220
>       Chicago, Illinois 60602
>       (312) 440-0020 telephone
>       (312) 440-4180 facsimile
>       www.attorneyzim.com
>
> Counsel for the Plaintiffs, the Collective Group, and the Classes

JENNIFER PHILLIPS and TONYA BUSH, )
individually, and on behalf of all others similarly )
situated, )
                               )
                Plaintiffs, )
                               )
     vs. )         No.
                               )
HELP AT HOME, INC., )
HELP AT HOME, LLC, )
STATEWIDE HEALTHCARE SERVICES, INC., )
STATEWIDE HEALTHCARE SERVICES, LLC, )
HAH GROUP HOLDING COMPANY, LLC, and )
RONALD FORD, )
                               )
               Defendants. )

## CONSENT TO BECOME A PARTY PLAINTIFF

       I, Jennifer Phillips, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.


Dated: _9-23-15_         *Jennifer Phillips*
                                         Jennifer Phillips

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH,   )
individually, and on behalf of all others similarly )
situated,   )
                           )
          Plaintiffs,   )
                           )
vs.   )
                           )   No.
HELP AT HOME, INC.,   )
HELP AT HOME, LLC,   )
STATEWIDE HEALTHCARE SERVICES, INC., )
STATEWIDE HEALTHCARE SERVICES, LLC, )
HAH GROUP HOLDING COMPANY, LLC, and )
RONALD FORD,   )
                           )
          Defendants.   )
_____   )

## CONSENT TO BECOME A PARTY PLAINTIFF

    I, Tonya Bush, formerly an employee of one or more of the above-captioned Defendants,

consent to become a party Plaintiff in the above-captioned action.

Dated: _9-23-15_

                                       _Tonya Bush_
                                       Tonya Bush

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER PHILLIPS and TONYA BUSH, individually, and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) No. 15 cv 8954 |
| HELP AT HOME, INC., and HELP AT HOME, LLC, | ) ) ) |
| Defendants. | ) ) ) |

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Katrina Collinge, formerly an employee of one or more of the above-captioned Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: 09/22/2017

_____
Signature of Former Employee

**EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH, )
individually, and on behalf of all others similarly )
situated, )
                        )
           Plaintiffs, )
                        )
      vs. )       No. 15 cv 8954
                        )
HELP AT HOME, INC., and )
HELP AT HOME, LLC, )
                        )
           Defendants. )
_____ )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Sabrina Owens, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: _9/22/17_                                  _____
                                                        Signature of Former Employee

**EXHIBIT D**

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS**

JENNIFER PHILLIPS and TONYA BUSH, )
individually, and on behalf of all others similarly )
situated, )
                                                    )
             Plaintiffs, )
                                                    )
      vs. )
                                                    )   No. 15 cv 8954
HELP AT HOME, INC., and )
HELP AT HOME, LLC, )
                                                    )
             Defendants. )
_____)

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Amanda Felgar, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: 9|6|18

Signature of Former Employee

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH,                )
individually, and on behalf of all others similarly  )
situated,                                        )
                                                 )
              Plaintiffs,       )
                                                 )
       vs.                                     )
                                                 )   No. 15 cv 8954
HELP AT HOME, INC., and                          )
HELP AT HOME, LLC,                               )
                                                 )
              Defendants.       )
_____  )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Tamatha Cheatham, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: 4 - 13 - 2018

Tamatha Cheatham
Signature of Former Employee

**EXHIBIT F**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH, )
individually, and on behalf of all others similarly )
situated, )
           )
           Plaintiffs, )
           )
     vs. )     No. 15 cv 8954
           )
HELP AT HOME, INC., and )
HELP AT HOME, LLC, )
           )
           Defendants. )
_____ )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Kimberly Niles, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: April 6th 2018

_____
Signature of Former Employee

**EXHIBIT G**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH,   )
individually, and on behalf of all others similarly  )
situated,   )
   )
       Plaintiffs,   )
   )
   vs.   )
   )   No.  15 cv 8954
HELP AT HOME, INC., and   )
HELP AT HOME, LLC,   )
   )
       Defendants.   )
   )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Helima Woodland, formerly an employee of one or more of the above-captioned Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: 4/18/2018

_____
Signature of Former Employee

**EXHIBIT H**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH,        )
individually, and on behalf of all others similarly  )
situated,                                )
                                         )
                    Plaintiffs,          )
                                         )
          vs.                            )
                                         )          No. 15 cv 8954
HELP AT HOME, INC., and                  )
HELP AT HOME, LLC,                       )
                                         )
                    Defendants.          )
                                         )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Kim Ward, an employee of one or more of the above-captioned Defendants, consent to

become a party Plaintiff in the above-captioned action.

Dated: 4-19-2018

Signature of Employee

**EXHIBIT I**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH, )
individually, and on behalf of all others similarly )
situated, )
                                )
             Plaintiffs, )
                                )
    vs. )
                                )   No.  15 cv 8954
HELP AT HOME, INC., and )
HELP AT HOME, LLC, )
                                )
            Defendants. )

## CONSENT TO BECOME A PARTY PLAINTIFF

    I, Deborah Haverkamp, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: 4-16-2018

                                   Signature of Former Employee

**EXHIBIT J**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

JENNIFER PHILLIPS and TONYA BUSH,   )
individually, and on behalf of all others similarly  )
situated,   )
   )
           Plaintiffs,   )
   )
      vs.   )
   )   No.  15 cv 8954
HELP AT HOME, INC., and   )
HELP AT HOME, LLC,   )
   )
          Defendants.   )
_____ )

## CONSENT TO BECOME A PARTY PLAINTIFF

I, Whitney Judson, formerly an employee of one or more of the above-captioned

Defendants, consent to become a party Plaintiff in the above-captioned action.

Dated: ___4/24/18___           _____
                                        Signature of Former Employee

**EXHIBIT K**

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JENNIFER PHILLIPS and TONYA BUSH, individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | No. 15 cv 8954 |
| HELP AT HOME, INC., and HELP AT HOME, LLC, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## <u>CONSENT TO BECOME A PARTY PLAINTIFF</u>

I, Kim Mays, formerly an employee of one or more of the above-captioned Defendants,

consent to become a party Plaintiff in the above-captioned action.

Dated: 6-1-18 _____

_____
Signature of Former Employee

**EXHIBIT L**